In the Supreme Court of Georgia

Decided:       July 8, 2016

S16A0013.  COTTRELL v. SMITH et al.

HINES, Presiding Justice.

This is an appeal by plaintiff, Stanley W. Cottrell, Jr. ("Cottrell"), from the grant of judgment notwithstanding the verdict ("JNOV") and earlier grants of directed verdicts in this action alleging defamation and related torts, and potentially implicating the constitutionality of portions of the Georgia Computer Systems Protection Act ("GCSPA"), OCGA § 16-9-90 et seq. The suit against five defendants: Glenn and Marian Crocker ("Crockers"), Hugh Johnson ("Johnson"), Peggy Smith ("Peggy"), and Karen Smith ("Karen"), hereinafter collectively "Defendants," arises out of online postings and other communications by Defendants about Cottrell.  For the reasons which follow, we affirm.

A brief overview of the facts is in order.  Cottrell for many years engaged in a number of solo running exhibitions with a Christian evangelical

emphasis, some of which have been portrayed in the media, and was subsequently involved in various multi-level marketing endeavors, executive leadership positions, and motivational speaking. Cottrell's notoriety grew along with media controversy relating to his character, which questioned the authenticity and integrity of his claims and achievements. The Crockers worked for Cottrell planning two running exhibitions; Johnson was a long-time friend of Cottrell's who came to know some women with whom Cottrell was involved outside of his marriage; Peggy is one of the women with whom Cotrell had an extra-marital affair; and Karen is Peggy's daughter-in-law. Karen located and contacted several people she believed had information about Cottrell, including the Crockers and Johnson. Karen and her husband created a "WordPress" blog (the "Blog") and posted stories based on this information, which portrayed Cottrell as having a long history of misrepresentation and deception for personal gain. Karen sent emails to a "list serve" group criticizing Cottrell and sharing links to the Blog posts, and Peggy sent messages to multiple Cottrell Facebook "friends" along the same lines.

Cottrell filed the present suit alleging a conspiracy among Defendants and a central claim of defamation with associated claims of invasion of privacy,

intentional infliction of emotional distress, tortious interference with business opportunities, breach of fiduciary duty, and violation of the GCSPA. The case was tried before a jury, and at the conclusion of Cottrell's case-in-chief, the superior court directed verdicts in favor of Defendants as to the claims for intentional infliction of emotional distress and violation of the GCSPA. The superior court then also expressed doubt about the viability of the remaining causes of action in light of the presented evidence but chose to allow such claims to go to the jury, and determined if necessary, it would entertain a JNOV. The jury returned a verdict on the defamation claim in favor of Cottrell and against Peggy and Karen; a verdict in favor of Defendants on the claim of tortious interference with business opportunities; a verdict in favor of Cottrell and against Defendants on the claim of invasion of privacy; and a verdict in favor of Cottrell and against Peggy and the Crockers on the claim of breach of fiduciary duty. The jury did not award special damages, but awarded general damages in the amount of $200,000, punitive damages in the amount of $150,000, and $285,000 in litigation expenses and attorney fees.[1] Judgment was

_____

[1]The jury did not find that the damages, which totaled $635,000, should be assessed jointly and severally as to all the defendants, and apportioned the damages: $269,000 as to Peggy, $293,250 as to Karen, $24,250 as to each of the Crockers, and $24,250 as to Johnson.

3

entered accordingly. Karen, Peggy, and Johnson filed post-trial motions for

JNOV, and in the alternative, for new trial. The superior court granted JNOV

and vacated the judgment entered on the jury's verdicts.

## I. *Directed Verdicts*

In reviewing the grant of a motion for a directed verdict, this Court applies

the "any evidence" test and construes the evidence in the light most favorable

to the losing party. *Hood v. Smoak*, 271 Ga. 86, 86-87 (516 SE2d 301) (1999).

A.) *GCSPA Claims.* Cottrell alleged that Defendants' conduct constituted

a violation or violations of Section 16-9-93.1[2] of the GCSPA, thereby giving

---

[2]OCGA§ 16-9-93.1 provides:

(a) It shall be unlawful for any person, any organization, or any representative of any organization knowingly to transmit any data through a computer network or over the transmission facilities or through the network facilities of a local telephone network for the purpose of setting up, maintaining, operating, or exchanging data with an electronic mailbox, home page, or any other electronic information storage bank or point of access to electronic information if such data uses any individual name, trade name, registered trademark, logo, legal or official seal, or copyrighted symbol to falsely identify the person, organization, or representative transmitting such data or which would falsely state or imply that such person, organization, or representative has permission or is legally authorized to use such trade name, registered trademark, logo, legal or official seal, or copyrighted symbol for such purpose when such permission or authorization has not been obtained; provided, however, that no telecommunications company or Internet access provider shall violate this Code section solely as a result of carrying or transmitting such data for its customers.
(b) Any person violating subsection (a) of this Code section shall be guilty of a misdemeanor.

(c) Nothing in this Code section shall be construed to limit an aggrieved party's right to pursue a civil action for equitable or monetary relief, or both, for actions which violate this Code section.

4

him a cause of action under Section 16-9-93 (g) (1).[3]

----

[3]OCGA § 16-9-93 provides:

(a) Computer theft. Any person who uses a computer or computer network with knowledge that such use is without authority and with the intention of:

    (1) Taking or appropriating any property of another, whether or not with the intention of depriving the owner of possession;

    (2) Obtaining property by any deceitful means or artful practice; or

    (3) Converting property to such person's use in violation of an agreement or other known legal obligation to make a specified application or disposition of such property shall be guilty of the crime of computer theft.

(b) Computer Trespass. Any person who uses a computer or computer network with knowledge that such use is without authority and with the intention of:

    (1) Deleting or in any way removing, either temporarily or permanently, any computer program or data from a computer or computer network;

    (2) Obstructing, interrupting, or in any way interfering with the use of a computer program or data; or

    (3) Altering, damaging, or in any way causing the malfunction of a computer, computer network, or computer program, regardless of how long the alteration, damage, or malfunction persists shall be guilty of the crime of computer trespass.

(c) Computer Invasion of Privacy. Any person who uses a computer or computer network with the intention of examining any employment, medical, salary, credit, or any other financial or personal data relating to any other person with knowledge that such examination is without authority shall be guilty of the crime of computer invasion of privacy.

(d) Computer Forgery. Any person who creates, alters, or deletes any data contained in any computer or computer network, who, if such person had created, altered, or deleted a tangible document or instrument would have committed forgery under Article 1 of this chapter, shall be guilty of the crime of computer forgery. The absence of a tangible writing directly created or altered by the offender shall not be a defense to the crime of computer forgery if a creation, alteration, or deletion of data was involved in lieu of a tangible document or instrument.

(e) Computer Password Disclosure. Any person who discloses a number, code, password, or other means of access to a computer or computer network knowing that such disclosure is without authority and which results in damages (including the fair market value of any services used and victim expenditure) to the owner of the computer or computer network in excess of $500.00 shall be guilty of the crime of computer password disclosure.

(f) Article not Exclusive. The provisions of this article shall not be construed to preclude the applicability of any other law which presently applies or may in the future apply to any transaction or course of conduct which violates this article.

(g) Civil Relief; Damages.

    (1) Any person whose property or person is injured by reason of a violation of any

Cottrell contends that the superior court erred in directing a verdict in favor of Defendants on such claims because there was evidence that Defendants' conduct violated § 16-9-93.1 and § 16-9-93, and because the court mistakenly relied upon *ACLU v. Miller*, 977 F.Supp. 1228 (N.D. Ga.,1997) to find that OCGA § 16-9-93.1 is unconstitutional.

In *ACLU v. Miller*, the plaintiff internet users brought an action for declaratory and injunctive relief challenging the constitutionality of OCGA § 16-9-93.1, and the District Court granted plaintiffs' motion for a preliminary injunction after concluding, inter alia, that the statute is unconstitutionally

---

provision of this article may sue therefor and recover for any damages sustained and the costs of suit. Without limiting the generality of the term, "damages" shall include loss of profits and victim expenditure.

(2) At the request of any party to an action brought pursuant to this Code section, the court shall by reasonable means conduct all legal proceedings in such a way as to protect the secrecy and security of any computer, computer network, data, or computer program involved in order to prevent possible recurrence of the same or a similar act by another person and to protect any trade secrets of any party.

(3) The provisions of this article shall not be construed to limit any person's right to pursue any additional civil remedy otherwise allowed by law.

(4) A civil action under this Code section must be brought within four years after the violation is discovered or by exercise of reasonable diligence should have been discovered. For purposes of this article, a continuing violation of any one subsection of this Code section by any person constitutes a single violation by such person.

(h) Criminal Penalties.

(1) Any person convicted of the crime of computer theft, computer trespass, computer invasion of privacy, or computer forgery shall be fined not more than $50,000.00 or imprisoned not more than 15 years, or both.

(2) Any person convicted of computer password disclosure shall be fined not more than $5,000.00 or incarcerated for a period not to exceed one year, or both.

overbroad and void for vagueness. It appears that the superior court based, at least in part, its grant of a directed verdict on the GCSPA claims on its favorable view of the analysis and holding in *ACLU v. Miller*.[4]  However, the superior court need not have considered any such constitutional challenge because a directed verdict was mandated in light of the statutory requirements of both OCGA § 16-9-93 and OCGA § 16-9-93.1.  Indeed, a trial court should first resolve other  questions regarding a statute before addressing an issue of constitutionality. *Deal v. Coleman*, 294 Ga. 170, 171 (n.7) (751 SE2d 337) (2013), citing *Bd. of Tax Assessors v. Tom's Foods*, 264 Ga. 309, 310 (444 SE2d 771) (1994).   What is more, it is well-settled that this Court will not decide a constitutional question if the decision in the appeal can be made upon other grounds. *Deal v. Coleman*, at 171 (n.7).   And, so it can in this case.

Pretermitting any questions as to the correctness and scope of the superior court's ruling in regard to the constitutionality of any portion of the GSPCA and

---

[4]The superior court stated in relevant part:

> I'm just going to follow that federal case.  I thought it was just right all over it. . . . That's a Northern District case, but it's a constitutional type issue . . . . I just like the reasoning. I don't think you can argue me out of that one.

of Cottrell's preservation of a constitutional issue for appeal,[5] the direction of a verdict on the GSPCA claims was demanded based upon the evidence, or rather the lack thereof, in regard to the alleged statutory violations. Cottrell variously argues that there was evidence of computer theft (OCGA §16-9-93 (a)), computer trespass (OCGA §16-9-93 (b)), computer invasion of privacy (OCGA §16-9-93 (c)) and computer forgery (OCGA § 16-9-93 (d)), and recites a litany of online actions by Defendants in support thereof; however, none of the cited conduct demonstrates, inter alia, the express specific criminal intent required in subsections (a), (b), ( c ), and (d).[6] There was simply a failure of the evidence in regard to the GCSPA claims.

B.) *Intentional Infliction of Emotional Distress*. In order to sustain a claim of the intentional infliction of emotional distress, four elements must be present:

(1) The conduct must be intentional or reckless; (2) The conduct

---

[5]While the superior court initially declined to let counsel for Cottrell give argument regarding its apparent ruling about the constitutionality of OCGA§ 16-9-93.1, it later permitted counsel to argue about Cottrell's claims in regard to that statute as well as OCGA§ 16-9-93; however, counsel principally argued the evidence in light of the provisions of OCGA§ 16-9-93, and in fact, expressly stated that he was not asking the superior court to "revisit" the constitutional ruling.

[6]The intent in subsection (d) is stated in terms of a person's creation, alteration, or deletion of data contained in a computer or computer network if such conduct would constitute the commission of the crime of forgery under Title 16, Chapter 9, Article 1, which crime requires the specific intent to defraud.

must be extreme and outrageous; (3) There must be a causal connection between the wrongful conduct and the emotional distress; and (4) The emotional distress must be severe.

*Northside Hosp.v. Ruotanen*, 246 Ga. App. 433, 435 (541 SE2d 66) (2000).

Whether a claim rises to the level of extreme and outrageous conduct necessary to support a cause of action for the intentional infliction of emotional distress is a question of law. *Blockum v. Fieldale Farms Corp.*, 275 Ga. 798, 801 (3) (573 SE2d 36) (2002), citing *Yarbray v. Southern Bell Tel. &c. Co.*, 261 Ga. 703, 706 (2) (409 SE2d 835) (1991). In assessing such conduct,

> it has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by malice, or a degree of aggravation that would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

*Northside Hosp.v. Ruotanen*, supra at 435. The standard was plainly not met in this case, including the showing of extreme emotional distress suffered by Cottrell as a result of the Defendants' actions.

The superior court properly granted the requested directed verdicts at

issue.

## II. JNOV

In reviewing a grant of JNOV, this Court must determine whether there was some evidence to support the jury's verdict or whether a consideration of all of the evidence demanded a judgment notwithstanding the verdict. *Keaton v. A.B.C. Drug Co.*, 266 Ga. 385, 385-386 (467 SE2d 558) (1996).

A.) *Defamation.* Cottrell's claims of defamation implicate both libel and slander. Libel is the "false and malicious defamation of another, expressed in print, writing, pictures, or signs, tending to injure the reputation of the person and exposing him to public hatred, contempt, or ridicule." OCGA § 51-5-1. Oral defamation constituting slander is of four categories:

> (1) Imputing to another a crime punishable by law; (2) Charging a person with having some contagious disorder or with being guilty of some debasing act which may exclude him from society; (3) Making charges against another in reference to his trade, office, or profession, calculated to injure him therein; or (4) Uttering any disparaging words productive of special damage which flows naturally therefrom.

OCGA § 51-5-4 (a). By the statutory express terms, the situation in category (4) requires special damage to support an action; however, damage is inferred in the

situations described in the remaining three categories. OCGA § 51-5-4 (b).

Indeed, such categories of slander have been engrafted into the libel statute, with

the result that libel in the nature of the first three categories of slander carries

with it the inference of damages. *Dun & Bradstreet, Inc. v. Miller*, 398 F.2d 218,

222 (n.5) (5th Cir. 1968).

Because the jury in this case found no special damages, a verdict for

defamation is sustainable only if there was defamation per se, which would

include slander per se. See OCGA §§ 51-5-1 and 51-5-4; *Dun & Bradstreet,*

*Inc. v. Miller*, supra at 222.

> To be slander per se, the words are those which are recognized as injurious on their face - without the aid of extrinsic proof. Should extrinsic facts be necessary to establish the defamatory character of the words, the words may constitute slander, but they do not constitute slander per se. Thus, the court may not hunt for a strained construction in order to hold the words used as being defamatory as a matter of law, and the negative inference a hearer might take from the words does not subject the speaker to liability for slander per se.

*Bellemead, LLC v. Stoker*, 280 Ga. 635, 637-638 (631 SE2d 693) (2006)

(Internal citations and quotation marks omitted.).

Truth is a complete defense to alleged libel or slander. OCGA § 51-5-6[7];

*Lucas v. Cranshaw*, 289 Ga. App. 510, 512 (1) (659 SE2d 612) (2008). And,

> a defamation action will lie only for a statement of fact. This is because a statement that reflects an opinion or subjective assessment, as to which reasonable minds could differ, cannot be proved false. As a result, a plaintiff who claims that a published opinion defamed him will generally be unable to carry his burden of proving the essential element of falsity. Still, . . . [t]here is ... no wholesale defamation exception for anything that might be labeled opinion. An opinion can constitute actionable defamation if the opinion can reasonably be interpreted, according to the context of the entire writing in which the opinion appears, to state or imply defamatory facts about the plaintiff that are capable of being proved false.

*Gettner v. Fitzgerald*, 297 Ga. App. 258, 261 (677 SE2d 149) (2009), citing

*Gast v. Brittain*, 277 Ga. 340, 341 (589 SE2d 63) (2003). (Internal quotation

marks omitted.).

Given the evidence at trial in this case, only two per se categories of

defamation could arguably apply: "[i]mputing to another a crime punishable by

---

[7]OCGA § 51-5-6 states:

The truth of the charge made may always be proved in justification of an alleged libel or slander.

12

law" or "[m]aking charges against another in reference to his trade, office, or profession, calculated to injure him therein." OCGA § 51-5-4 (a) (1) & (3). And, the requirements for slander per se apply to libel per se because, as noted, the definition of slander in Georgia has been incorporated into the definition of libel. *Cmty. Newspaper Holdings, Inc. v. King*, 299 Ga. App. 267, 270 (2) (682 SE2d 346) (2009).

> In regard to imputing a crime,
>
> [t]o constitute slander per se, ... the words at issue must charge the commission of a specific crime punishable by law. Where the plain import of the words spoken impute no criminal offense, they cannot have their meaning enlarged by innuendo.

*Dagel v. Lemcke*, 245 Ga. App. 243, 244 (1) (537 SE2d 694) (2000). Indeed, the statement must give the impression that the crime is actually being charged against the individual and couched in language as might reasonably be expected to convey such meaning to a hearer of the statement; a vague statement or even a derogatory one does amount to slander per se when a person cannot reasonably conclude from what is said that the comments are imputing a crime to the plaintiff. *Taylor v. Calvary Baptist Temple*, 279 Ga. App. 71, 73-74 (3) (630 SE2d 604) (2006).

As for defamation in regard to a trade, profession, or office,

[t]he kind of aspersion necessary to come under this phase of the rule of slander per se must be one that is especially injurious to the plaintiff's reputation because of the particular demands or qualifications of plaintiff's vocation.... [T]he words must either be spoken of the plaintiff in connection with his calling or they must be of such a nature such as to charge him with some defect of character or lack of knowledge, skill, or capacity as necessarily to affect his competency successfully to carry on his business, trade, or profession.

*Bellemead, LLC v. Stoker*, supra at 637. Furthermore,

[a]lthough statements disparaging a business' reputation within its trade may sometimes constitute libel per se, language imputing to a business or professional man ignorance or mistake on a single occasion and not accusing him of general ignorance or lack of skill is not actionable per se. A charge that plaintiff in a single instance was guilty of a mistake, impropriety or other unprofessional conduct does not imply that he is generally unfit.

*Kin Chun Chung v. JP Morgan Chase Bank, N.A.*, 975 F. Supp. 2d 1333, 1349

(N.D. Ga. 2013)

Certainly,

some persons may hold positions with such pervasive fame or power that they are deemed public figures for all purposes, but more often an individual voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues. Whether a person is a public figure is a question of law that requires the court to review the nature and

14

extent of the individual's participation in the specific controversy that gave rise to the [alleged] defamation. . . . [A] three-part analysis [is] used . . . to determine whether an individual is a limited-purpose public figure. Under this analysis, a court must isolate the public controversy, examine the plaintiff's involvement in the controversy, and determine whether the alleged defamation was germane to the plaintiff's participation in the controversy.

*Mathis v. Cannon*, 276 Ga. 16, 22-23 (3) (573 SE2d 376) (2002) (Internal

quotation marks omitted.). With regard to a public figure,

The standard of proof of actual malice . . . is extremely high; [it must be shown] by clear and convincing evidence that false and defamatory statements were published with actual malice. Actual malice in a constitutional sense is not merely spite or ill will, or even outright hatred; it must constitute actual knowledge that a statement is false or a reckless disregard as to its truth or falsity. Actual or constitutional malice is different from common law malice because knowledge of falsity or reckless disregard of the truth may not be presumed nor derived solely from the language of the publication itself. Reckless disregard requires clear and convincing proof that a defendant was aware of the likelihood he was circulating false information. Thus, it is not sufficient to measure reckless disregard by what a reasonably prudent man would have done under similar circumstances nor whether a reasonably prudent man would have conducted further investigation. The evidence must show in a clear and convincing manner that a defendant in fact entertained serious doubts as to the truth of his statements.

*Atlanta Humane Soc. v. Mills*, 274 Ga. App. 159, 165 (3) (618 SE2d 18) (2005)

15

(Internal quotation marks and citations omitted.).

Cottrell claims that the statements at issue constituted defamation per se, and complains that although the superior court found him to be a limited purpose public figure in the areas of running and Christian evangelism, in granting JNOV the superior court erroneously applied the "clear and convincing" evidence standard to every aspect of the defamation. However, Cottrell properly was found to be a public figure in the spheres of running and Christian evangelism. And contrary to Cottrell's urging, the actual malice standard should be applied to all statements at issue here because they all potentially bear on Cottrell's character, which is plainly germane to his Christian evangelism.

*Statements at Issue*

1.) *A 2010 post on Karen's "You Shall Know the Truth" blog entitled "This Guy Needs to be Stopped."* [8] This "Resnick" post, which is the focus of

---

[8]The post reads in its entirety:
 You Shall Know The Truth
"This Guy Needs To Be Stopped"
Posted on September 19, 2010
As told to me by Dr. Joseph Resnick.
*********************************************..
About 2 months ago Stan Cottrell befriended me on Facebook.
I couldn't believe that he wanted to be my "friend" after everything he has done to me and

16

Cottrell's arguments on appeal in regard to defamation, contained information

my family. I sent him an irate message letting him know I was coming after him.
I had no idea he was trying to raise money for a worldwide run, or that he was taking money from unsuspecting women. I thought he was just involved in investment scams. My involvement with him began about 8 years ago thru his affiliation with BICO, Inc. I owned 50% of one of the company's subsidiaries. I also served as chief scientist and I developed new products for the company. Stan had been brought into BICO as a board member and then served as CEO after Fred Cooper stepped down.
I had $8 million invested in the company and lost it all through fraud that was perpetrated by Stan and others at the company. Fred Cooper was the only one who was convicted of a crime. And his sentence was essentially a slap on the wrist.
These people did more than take my money. They also stole from my children.
My children own the holding company that owns my patents, and through the actions of unscrupulous lawyers my patents got tied up in the courts when BICO's lawyers filed for bankruptcy.
Stan's job was to keep me at bay while they stole the patents. He participated in the theft of my technology.
I developed encapsulation technology that uses biological agents to encapsulate oil I developed it for peaceful means, to help clean the environment. It was used to clean up oil from the Exxon Valdeze oil spill.
Those who stole my technology are still trying to sell my products. They are attempting to weaponize my technology and sell it to other countries - they want to use it to deploy biological weapons. I have begun legal action against them for illegally using my patents and attempting to illegally export my products.
I am willing to appear in any court - anytime, anywhere - and testify to what Stan did to me and my family. I hope he sues me for libel and slander so I can stand up in court and testify about what he has done.
When I first met Stan he came under the guise of the Lord. He wanted to start business meetings at BICO with prayer. After I realized what he was really up to, that he spends lots of time thinking about how to separate people from their money, he told me, "If the Lord didn't want them sheared, he wouldn't have made them sheep."
I worked hard for every penny I have ever had. I can't believe Stan Cottrell thinks he is entitled to the money others have earned through their own hard work.
He has taken money from a lot of people, and it's a shame that more of them are not willing to come forward about their experiences with him. It's a shame this has gone on for so long.
Please express to your mother-in-law my condolences for her involvement with this guy, and my admiration for her willingness to come forward.
This guy needs to be stopped.
Dr. Joseph
Resnick
September 2, 2010

17

told to Karen by Dr. Joseph  Resnick, a biotechnology scientist who worked with Cottrell at a company called BICO, where Cottrell was a CEO. It was there, according to Resnick, where Cottrell *"participated in the theft of[Resnick's] technology."* The post also contains, inter alia, Resnick's assertions, re-told by Karen, that "*I had $8 million invested in the company and lost it all through fraud that was perpetrated by Stan and others at the company"* and that Cottrell *"has taken money from a lot of people, and it's a shame that more of them are not willing to come forward about their experiences with him.*"

To begin with, in regard to the claim that the comment about Cottrell "*participat(ing) in the theft of [Resnick's] technology*" on its face is arguably per se defamatory as imputing a crime, as the superior court found, much of the objected-to content in the Resnick post is not properly characterized as defamatory on the part of Karen.  More significantly, there is the lack of evidence of "actual malice" by Karen  in connection with the post. Again, the "actual malice" standard must be applied because the objectionable comments are germane to Cottrell's public figure status as a Christian evangelist. Indeed, "a publication is germane to a plaintiff's participation in a controversy if it might help the public decide how much credence should be given to the

18

plaintiff." *Atlanta Journal-Constitution v. Jewell*, 251 Ga. App. 808, 820 (3) (c) ( 555 SE2d 175 ) (2002). Notably, the post itself makes reference to Cottrell's evangelism ("*When I first met Stan he came under the guise of the Lord. He wanted to start business meetings at BICO with prayer*.").

As the superior court determined, the evidence relating to the Resnick post, even when construed in favor of the verdict, fails to "clearly and convincingly" demonstrate "actual malice" - that Karen published the Resnick post with "reckless disregard" for whether it was true. *Atlanta Humane Soc. v. Mills*, supra 165 (3). Karen testified that she became aware of a scathing Facebook "message" by Resnick, whom she did not know, on a Cottrell Facebook page created by the Crockers. In the message, Resnick called Cottrell numerous derogatory names and accused him of deception and fraud, which prompted Karen to want to learn about Resnick's experiences with Cottrell, so she located Resnick through the Internet, emailed him, and spoke with him on the phone. There were several communications between Karen and Resnick about his personal experiences with Cottrell. Resnick, talked about his experiences with Cottrell at BICO and Resnick's belief that patents were stolen from him and that Cottrell had a role in this. Karen took a lot of notes. What was

reported in the Blog is what Resnick told Karen. In fact, before posting the Resnick story on her Blog, Karen emailed a draft of the proposed post to Resnick, and asked him to "take a look at what I have written below from our conversation today and check to make sure my facts are correct." Resnick replied by email that it looked fine except with reference to an individual who had not given permission to be named. Karen responded that she would omit reference to such individual and would not add anything more of substance to the post without Resnick's okay.

There is no evidence, much less "clear and convincing" evidence, that Karen disbelieved what Resnick told her or that she otherwise had a high degree of awareness of the probable falsity of what she posted. As concluded by the superior court, the evidence more forcefully supports the opposite conclusion, i.e., that Karen believed what Resnick told her and what she posted. [9] Simply, the Resnick post cannot support a verdict for defamation.

2.) *Other Blog posts.*[10] As the superior court correctly noted, statements

_____

[9]Cited as evidence that Karen knew that her Resnick post was false is an email from her to Peggy and another indicating that Cottrell had "probably not done anything illegal"; however, it appears that such comment related specifically to an unrelated investigation involving BICO.

[10]As noted, Cottrell's attempt to save the verdict on defamation is focused on the BICO Blog post; however, inasmuch as this Court is to review any evidence of defamation which would uphold

20

in the initial post entitled "*About*" that "*Mr. Cottrell has not accomplished what he claims to have done*" and the post entitled "*His Runs Aren't Even Real*," as told to Karen by Karen N. Frances are fairly characterized as opinion. But, even if these statements could amount to libel per se as making charges in regard to Cottrell's trade or profession, there is no evidence of actual malice on the part of Karen, i.e, that Karen believed or entertained serious doubts as to whether Cottrell's runs were legitimate. Indeed, prior to publishing these posts, Karen communicated with Frances, and Frances related to Karen that Cottrell did not run all the miles he claimed he did. Karen had also become aware that certain running experts questioned the veracity of Cottrell's records.

Also as found by the superior court, remarks in a "*Master of Hyperbole*" post that Cottrell is "*not trustworthy*" and "*[his]activities with the women that he has deceived and taken money from are criminal*" amount to opinion, and there is no evidence these posts were made with actual malice. In fact as noted by the superior court, Cottrell apologized during his testimony for certain indiscretions and actions towards women, thus admitting the truth of these types

---

the verdict, this Court will examine other posts and emails raised in opposition to the JNOV.

21

of statements, at least to a certain degree.[11] The comment in a "*More Vanishing Stan Cottrell Web Content*" post "*seems like a scam artist is on the loose Beware ladies - he's a sly one. ...*" is likewise opinion and here again there is no evidence of actual malice. Moreover, the evidence at trial established that Cottrell had two affairs (Peggy and Karen Frances) and other women testified about Cottrell's pursuit of them and/or their intimacy with Cottrell outside of his marriage. Several of these women and other witnesses attested to giving or loaning money to Cottrell and not being paid back.

Lastly, a Blog post entitled "*$800,000 Judgement,*" contains the statement "*According to the Pittsburgh Business Times, Stan Cottrell served as CEO and director of BICO, Inc. An 8-k BICO, Inc. filing with the Securities and Exchange Commission reflects a judgment in the amount of $800,000 against him by a Pennsylvania court.*" And, as the superior court correctly found, this does not communicate a defamatory fact and is not defamatory per se, and a judgment had in fact been entered against Cottrell, though apparently it subsequently was dismissed, and the Pittsburgh paper reported on the judgment. Karen put the

---

[11]At oral argument before this Court, Cottrell's attorney admitted that Cottrell had two extra-marital affairs.

information she learned from the paper in her Blog and there is no evidence she knew it to be incorrect.

This Court has found no evidence to support a finding of "actual malice" on the part of either Karen or Peggy with regard to the Blog posts at issue.

3.) *Various list- serve emails.* The list- serve emails sent by Karen and examined by the superior court likewise do not support a finding of defamation.[12] To the extent that they contain objectionable implications that Cottrell is involved with shady businesses, the remarks are germane to his character and his public figure status as a Christian evangelist. What is more, many of the comments are in the nature of opinion. As for references to Cottrell's having extra-marital affairs, he admittedly had several such

---

[12]The superior court specifically addressed remarks in the following emails denominated as Exhibits.

a.)Exhibit P38, contains several statements in issue: "*experts in running knew 2 records he claimed in the 1980s were fake,*" and "*in the 1990s he was involved in promoting a transdermal patch. . .and many people lost money in it when it was revealed the patch was just plastic and glue.*"

b) Exhibit P202 contains the statements: "*he cultivates and grooms his victims like a child molester. He creates a trusting relationship with them and creates the environment for them to cooperate and voluntarily do what he wants them to do. Then when they learn the truth they are devastated . .They feel guilty for doing something they know was wrong. and they blame themselves for not being able to tell ahead of time.*"

c) Exhibit P315, states:"*It may be possible to charge him with theft by deception, but not enough people have been willing to come forward. They are too embarrassed. The women he had affairs with become emotionally devastated. His public persona is so larger than life they think no one will believe them. His business partners are embarrassed, too. They feel that people knowing they were involved with him, and that he took advantage of them, would make them look stupid.*"

relationships. And, most significantly, the statements are based on at least some evidence and there was no evidence that any of the comments were made with "actual malice."

4.) *Peggy's Facebook messages to Cottrell's Facebook "friends."* The focus is on one sent to "John Vanderveld." It quotes a post from "Owen" on a running blog and indicates that Cottrell: "*reported seeing MIA's in Viet Nam, apparently as part of a scam so he could make millions off the families of missing Americans.* " Here, again as correctly found by the superior court, there was no evidence at trial that Peggy was aware of the likelihood that she was circulating false information about Cottrell spotting MIA soldiers on his Viet Nam run, and therefore, no actual malice. There was also evidence at trial that there was some question by United States government officials in regard to Cottrell's statements about what he observed while in Viet Nam.

The Facebook message to Vanderveld further stated:

*"He's been involved as a board member of many companies selling scam products such as patches supposedly to help runners run better -- they were eventually discovered to be just plastic with adhesive on them. Someone else also reported that most of the time on these Ultra 'runs' he spends the journey*

24

*riding in vehicles and when he gets near a town, he gets out and then runs about 2 or 3 Km. into the town to be met by the mayor who applauds his so called running ability "*

But again, there was no evidence of actual malice with respect to these statements which would relate to Cottrell's character controversy and status as a runner and/or Christian evangelist. Furthermore, there was evidence at trial of Cottrell's involvement with a company called "Lifewave" and that there was controversy related to the "energy patch" marketed by the company.

Simply, as the superior court concluded, none of the arguably defamatory statements, even construing the evidence in favor of the verdict, can support Cottrell's claims of defamation.

B.) *Breach of Fiduciary Duty.*

The verdict includes a finding against Peggy and the Crockers for breach of fiduciary duty. Peggy, by virtue merely of her status as a paramour of Cottrell's, owed no fiduciary duty to Cotttell. A relationship is deemed to be confidential, whether it arises from nature, law, or contract, where the party is situated so as to exercise a controlling influence over the will, conduct, and interest of another or where the law requires the utmost good faith from a

relationship of mutual confidence. OCGA § 23-2-58.[13] "And it is well settled

that '[t]he party asserting the existence of a confidential relationship has the

burden of establishing its existence.'" *Monroe v. Bd. of Regents of Univ. Sys. of*

*Georgia*, 268 Ga. App. 659, 661-662 (1) (602 SE2d 219) (2004). This Cottrell

failed to do in regard to Peggy.

As to Cottrell's principal fiduciary claim on appeal that Peggy aided and

abetted or somehow induced a breach of fiduciary duty by the Crockers, Cottrell

would have to prove four elements:

> (1) through improper action or wrongful conduct and without privilege, the defendant acted to procure a breach of the primary wrongdoer's fiduciary duty to the plaintiff; (2) with knowledge that the primary wrongdoer owed the plaintiff a fiduciary duty, the defendant acted purposely and with malice and the intent to injure; (3) the defendant's wrongful conduct procured a breach of the primary wrongdoer's fiduciary duty; and (4) the defendant's tortious conduct proximately caused damage to the plaintiff.

*Insight Tech., Inc. v. FreightCheck*, LLC, 280 Ga. App. 19, 25-26 (1) (a) (633

---

[13]OCGA § 23-2-58 provides:

Any relationship shall be deemed confidential, whether arising from nature, created by law, or resulting from contracts, where one party is so situated as to exercise a controlling influence over the will, conduct, and interest of another or where, from a similar relationship of mutual confidence, the law requires the utmost good faith, such as the relationship between partners, principal and agent, etc.

SE2d 373) (2006). Assuming for the sake of argument and for the aforementioned analysis, that the Crockers are the "primary wrongdoers," there was no evidence that the Crockers, who worked with Cottrell on two of his running projects, themselves owed Cottrell a fiduciary duty.

> [T]he mere circumstance that . . . people have come to repose a certain amount of trust and confidence in each other as the result of business dealings is not, in and of itself, sufficient to find the existence of a confidential relationship.

*Parello v. Maio*, 268 Ga. 852, 853 (1) (494 SE2d 331) (1998). Thus, Cottrell's claims of breach of fiduciary duty must fail.

C.) *Invasion of Privacy.*

The jury found against Defendants for invasion of privacy based on the public disclosure of embarrassing private facts.

> There are at least three necessary elements for recovery under this theory: (a) the disclosure of private facts must be a public disclosure; (b) the facts disclosed to the public must be private, secluded or secret facts and not public ones; (c) the matter made public must be offensive and objectionable to a reasonable man of ordinary sensibilities under the circumstances. The interest protected is that of reputation, with the same overtones of mental distress that are present in libel and slander. It is in reality an extension of defamation, into the field of publications that do not fall within the narrow limits of the old torts, with the elimination of the defense of truth.

*Cabaniss v. Hipsley*, 114 Ga. App. 367, 372-373 (2) (151 SE2d 496) (1966) (Internal citations and quotation marks omitted.). As stated, in a public disclosure case, the embarrassing private fact "must be private, secluded or secret facts and not public ones." *Cabaniss* supra at 372 (2). Accordingly, the protection afforded an individual's right to privacy may be withdrawn "'to whatever degree and in whatever connection [his] life has ceased to be private.'" Id. at 374 (2). In the case at bar, the disclosures upon which Cottrell's invasion of privacy claim rests related to two issues at trial: Cottrell's multiple affairs with married women, and his having not completed all of his long distance runs. Cottrell now focuses solely on the disclosure of his extra-marital affairs; however, they cannot support a verdict for invasion of privacy principally because the facts allegedly disclosed by Defendants were not private.

There is no dispute that Cottrell publicly traveled with Frances, and that both he and Frances revealed the affair to others. His other admitted affair, the one with Peggy, was likewise not private. Peggy herself expressly disclosed the relationship to others and that Cottrell and Peggy openly acknowledged their close relationship by having Cottrell accompany Peggy to her family

28

gatherings.[14] There is simply no basis upon which to sustain the jury verdict against Defendants for invasion of privacy based on the public disclosure of embarrassing private facts.

In summary, a judgment notwithstanding the verdict was warranted in this case.

Judgments affirmed. All the Justices concur.

---

[14]It should also be noted that with respect to any embarrassing public disclosures by Defendants in regard to Cottrell's running, there was evidence at trial of longtime prior discussions in distance-running circles of the authenticity of Cottrell's records and achievements.