**SECOND DIVISION
MILLER, P. J.,
DOYLE, P. J., and REESE, J.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules**

**March 5, 2018**

# In the Court of Appeals of Georgia

A17A2112. MURRAY v. COMMUNITY HEALTH SYSTEMS
PROFESSIONAL CORP. et al.

MILLER, Presiding Judge.

Dr. Mary Murray was fired from her position as an OB/GYN with Augusta Physicians Services ("APS") after she complained that the CEO of both Trinity Hospital and APS, Jason Studley, ordered her to make patient referrals to Trinity Hospital that she believed violated the federal self-referral law known as the Stark Act. She sued Studley, APS, and Community Health Systems Professional Services Corporation ("CHSPSC"),[1] the company that provided management services to APS. In her complaint, Murray alleged that Studley retaliated against her, in violation of

---

[1] Murray amended her complaint three times. The only relevant changes in the complaint substituted CHSPSC for another company and added an allegation that Studley acted as an agent of CHSPSC.

the Georgia False Medicaid Claims Act, OCGA § 49-4-168.4; that he was an agent of APS and CHSPSC; and that following her termination he made defamatory statements to two other physicians, Dr. Joseph and Dr. Davis.[2] The trial court granted summary judgment to all defendants on all claims, and this appeal followed.

After a thorough review of the record, we conclude that Murray failed to establish a prima facie case of retaliation, and therefore, we affirm the grant of summary judgment to all defendants on this claim. With respect to the defamation claims, we conclude that the statements Studley made to Dr. Joseph were privileged, and we affirm the grant of summary judgment to all defendants on this claim. However, the statements Studley made to Dr. Davis were not privileged as a matter of law. Therefore, we vacate the trial court's award of summary judgment to Studley on this claim and remand the case for further proceedings. As to defendants APS and CHSPSC, there is no evidence that Studley was "expressly directed or authorized" to make the statements to Dr. Davis, as is required to establish vicarious liability, and

---

[2] Murray also alleged tortious interference with business relationship and breach of contract, but she does not appeal from the grant of summary judgment on these claims. In her initial complaint, she also alleged violations of OCGA § 23-3-122, but she later abandoned this claim.

the trial court properly determined they were entitled to summary judgment on this defamation claim as well.

> Summary judgment is proper when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. OCGA § 9–11–56(c). A de novo standard of review applies to an appeal from a grant of summary judgment, and we view the evidence, and all reasonable conclusions and inferences drawn from it, in the light most favorable to the nonmovant.

(Citation omitted.) *Caldon v. Bd. of Regents of the Univ. System of Ga.*, 311 Ga. App. 155 (715 SE2d 487) (2011).

So viewed, the evidence shows that Studley is the CEO of both Trinity Hospital and APS, two entities owned by the same umbrella corporation. APS employs various doctors in designated practice groups, including OB/GYN. CHSPSC is a physician management company that provides consulting services such as business strategy, capital planning, and acquisitions to Studley in his capacity as CEO of APS. CHSPSC was never Studley's or Murray's employer.

In 2011, Dr. Murray was recruited to Trinity Hospital, and she and another physician, Dr. Christie, formed an OB/GYN practice under APS. Murray's initial contract was renewed at the end of the first year, and, as Murray admits, the contract

3

also provided that she could be terminated without cause. These employment contracts were approved by CHSPSC management and listed APS as Murray's employer.

Although Murray was employed by APS, and APS was affiliated with Trinity Hospital, she sometimes referred patients to other area hospitals, a practice referred to as "splitting." These other referrals negatively impacted Trinity Hospital's revenue, and Studley occasionally inquired as to why Murray made them. Given that one of the hospital's goals was to minimize losses resulting from referrals elsewhere, Studley created a plan to help Murray increase her productivity at Trinity Hospital and minimize splitting.

On or about July 13, 2013, Studley held a meeting with Murray, APS CFO Elmer Polite, and APS administrative manager Deann Brooks. During this meeting, Studley instructed Murray to refer all of her patients to Trinity Hospital for all surgical procedures and essentially prohibited her from treating patients at any hospital other than Trinity. Murray informed Studley that this was "not really what [she] signed up for," but she discussed placing a sign in the office to inform patients that she would only be providing services at Trinity Hospital.

4

After this meeting, Murray discussed the instruction with Brooks, Dr. Christie, and her practice office manager, Susan Allen, stating that she did not think it was a good idea because patients would be upset. Murray also expressed concern to Brooks that such referrals would violate federal Stark law, which prohibits doctors from making referrals to entities in which they have a financial interest and submitting claims for such services for payment under Medicare or Medicaid,[3] given that the hospital and APS were both owned by the same corporation. See generally 42 USC § 1395nn (a), (g).

In response to Murray's concern, Brooks stated she would talk to Studley. Within the next few days, Brooks told Murray to "just ignore" Studley's new rule, that Brooks thought Studley had been mad when he gave the instruction, and that Studley had "taken that back."

In an e-mail dated July 20, 2013, Polite advised Studley that Trinity Hospital and APS needed to eliminate between 45 to 50 positions, leading Studley to impose a reduction in force. About 20 people, including Murray and one of her staff members, were terminated in the reduction. Studley estimated he saved about 30 other

---

[3] Georgia has a similar provision prohibiting self-referrals. OCGA § 43-1B-4.

5

jobs by terminating Murray, although he could not identify which specific jobs were saved.

Although Studley stated that Murray's termination was part of the reduction in force, he later gave conflicting explanations for Murray's termination, including that he terminated Murray because of (1) financial concerns after she repeatedly fell below performance expectations, (2) concerns about her overhead and expenses because she was not generating enough revenue to defray her contribution towards those costs, (3) complaints from patients that they experienced long wait times, (4) concerns that Murray treated her Medicaid patients differently from other patients, and (5) a contract dispute or failed contract negotiations. Studley told Murray that "the corporation" was forcing him to fire her, along with many other people. However, after Murray's termination, there was an advertisement for an OB/GYN position at Trinity Hospital.

Following her termination, Murray was unable to join another practice in the Augusta area, and she requested a letter of recommendation from Studley to facilitate her job search elsewhere. Studley refused to provide a letter because Murray had not signed a release of information, per hospital policy. Dr. Allan Joseph, who was chair of the OB/GYN Department at Trinity Hospital, a member of the hospital medical

6

executive committee, and a member of the hospital board, approached Studley to discuss writing a letter for Murray. During this meeting, Joseph asked Studley about Murray's termination. Studley told Joseph that he could not discuss all the reasons, but he had been concerned that Murray had treated patients covered by Medicaid less favorably. Studley also told Joseph that Murray had been on probation prior to her termination, and that Murray was aware of his concerns. Nevertheless, Studley agreed to allow Joseph to write Murray a letter of recommendation on hospital letterhead.

Dr. Wendy Davis, a general surgeon who sometimes referred patients to Murray and was friendly with Murray socially, also spoke with Studley about Murray's termination. Davis initiated this conversation in the doctor's lounge, but no one else was present at the table. In this discussion, Studley allegedly mentioned that he had been concerned that Murray was treating her Medicaid patients less favorably. However, Studley denied making such a statement. The trial court granted summary judgment to all defendants on all claims, and this appeal followed.

Before turning to the merits of Murray's claims on appeal, we briefly set out the federal statutory scheme known as the Stark Act. The Stark Act prohibits healthcare entities from submitting Medicare claims for payment based on patient referrals from physicians having a "financial relationship" with the entity. 42 USC

§ 1395nn. The Act also prohibits a healthcare entity from presenting or causing to be presented a Medicare claim for services furnished pursuant to a prohibited self-referral. 42 USC § 1395nn (a) (1) (B). Notably, there are various safe harbor provisions that permit certain self-referrals under specific conditions, including bona fide employment relationships. See 42 USC § 1395nn (b), (e) (2). However, even in the context of a bona fide relationship, the compensation arrangement between the physician and the health care entity must "not [be] determined in a manner that takes into account (directly or indirectly) the volume or value of any referrals by the referring physician." 42 USC § 1395nn (e) (2) (B) (ii). With this framework in mind, we turn to Murray's claims for retaliation and defamation.

1. Retaliation

Murray argues that she was terminated in retaliation for her complaint about conduct she believed to violate the Stark Act. We disagree.

The Georgia False Medicaid Claim Act ("GFMCA") provides,

[a]ny employee, contractor, or agent shall be entitled to all relief necessary to make such employee, contractor, or agent whole, if that employee, contractor, or agent is discharged . . . because of lawful acts done by such employee, contractor, agent or associated others in furtherance of a civil action under this Code section *or other efforts to stop one or more violations of this article*.

8

(Emphasis supplied.) OCGA § 49-4-168.4 (a).

Our courts have had little opportunity to address the retaliation provision of the GFMCA. The statutory language in the GFMCA, however, mirrors the language in the federal False Claims Act, 31 USC 3730 (h), and courts generally look to federal case law to decide issues under the GFMCA. See *Reddick v. Jones*, 1:14-CV-0020-AT, 2015 WL 1519810, * 6 (III) (A) (3) (N. D. Ga. 2015) (applying federal False Claims Act case law to GFMCA claims). Retaliation claims under these statutes are analyzed under the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U S 792 (93 SCt 1817, 36 LE2d 668) (1973). See *U. S. ex rel. Parato v. Unadilla Health Care Center, Inc.*, 787 FSupp2d 1329, 1341 (III) (C) (M. D. Ga. 2011). Under this framework,

> [t]o establish a prima facie case of retaliation, a plaintiff must prove that (1) the employer is covered by the act at issue, (2) the employee engaged in protected activity, (3) the employee suffered adverse action, and (4) there is an inference of causation between the protected activity and the adverse action. A prima facie case of retaliation raises a presumption that the employer is liable to the employee, and the burden of production, but not the burden of persuasion, shifts to the employer to articulate a legitimate, nonretaliatory reason for the employment action. The burden then returns to the plaintiff to prove that the employer's reasons are pretextual. The employee can meet this burden "either

9

directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." If the proffered reason is one that might have motivated a reasonable employer, the employee "must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason."

(Citations omitted.) Id. at 1341-1342 (III) (C).

a. Claims against Studley and APS[4]

As to the prima facie case of retaliation, the parties dispute only the second and fourth prongs – that Murray engaged in protected activity when she complained to Brooks that Studley's order violated the Stark Act, and that there is a causal connection between her complaint and her termination.

---

[4] Studley can be liable only in his capacity as CEO of APS, not individually. See *U. S. ex rel. Parato*, supra, 787 FSupp2d at 1341 (III) (C) (the proper defendant in a retaliation action under the False Claims Act is the employer, which does not include a supervisor in his individual capacity). Notably, the language in the False Claims Act specifies protection against acts done by the "employer," whereas the GFMCA does not include such language. Nevertheless, Studley's actions were taken solely in his capacity as the CEO, and the remedies available under the retaliation provision of the GFMCA, such as reinstatement and back pay, are not recoverable from Studley individually. See OCGA § 49-4-168.4 (b).

10

Pretermitting whether Murray engaged in any protected activity under the statute, we conclude that she cannot show a causal connection between her Stark Act complaint and her termination.

To establish the requisite causal connection, Murray must show that her complaint and her termination were not "wholly unrelated." *Clover v. Total Systems Svcs., Inc.*, 176 F3d 1346, 1354 (III) (B) (11th Cir.1999). At a minimum, this requires very close temporal proximity and evidence that Studley was aware of Murray's Stark Act complaint at the time he made the decision to terminate her employment. *Holifield v. Reno*, 115 F3d 1555, 1566 (II) (B) (2) (11th Cir. 1997).

Given the two-week period between Murray's complaint about self-referrals and her termination, Murray has sufficiently set out a temporal connection between the two. See *Thomas v. Cooper Lighting, Inc.*, 506 F3d 1361, 1364 (III) (11th Cir. 2007); *Parato*, supra, 787 FSupp2d at 1344-1345 (III) (C) (eight-day time period between protected conduct and termination was sufficient causal connection). However, Murray has failed to show that Studley was aware of her complaint at the time he decided to terminate her. *Holifield*, supra, 115 F3d at 1566 (II) (B) (2); *Freeman v. Smith*, 324 Ga. App. 426, 431 (1) (750 SE2d 739) (2013).

Our review of the record confirms that there was no evidence that Studley knew of Murray's Stark Act complaint at the time he fired her. Murray did not make her Stark Act complaint directly to Studley. According to Murray's testimony, she made the complaint to Deann Brooks, the administrative manager for APS. In response, Brooks said she would talk to Studley. Brooks later told Murray to ignore the instruction because Studley changed his mind. However, Brooks did not testify that she advised Studley about Murray's complaint of a potential Stark Act violation, or that she identified Murray to Studley as the individual raising a Stark Act complaint, and Studley never stated in his deposition that he was aware of Murray's complaint.

Importantly here, during depositions, Murray's counsel did not ask Brooks what, if anything, she told Studley about Murray's complaint, nor did he ask Studley about what Brooks told him. Thus, there is simply no telling the content of the conversation between Brooks and Studley. Instead, the record is devoid of evidence showing that Studley knew of Murray's exact complaint, or evidence that would at least have raised an inference for the jury to decide if Studley knew. Murray's mere speculation about what Brooks said to Studley is insufficient to establish or even raise

a question of fact as to whether Studley was aware of Murray's complaint.[5] *Clover*, supra, 176 F3d at 1355 (III) (B) (evidence that employee "could have told" employer of plaintiff's protected conduct was not the same as "did tell" and thus was insufficient for any reasonable jury to find that the employer was aware of the protected conduct); *Freeman*, supra, 324 Ga. App. at 432 (1) (plaintiff's speculation that her employer knew of her protected activity was insufficient to establish causal connection). See also *Forrester v. Ga. Dep't of Human Svcs.*, 308 Ga. App. 716, 729 (1) (a) (iv) (708 SE2d 660) (2011) ("with no evidence that the actual decision-maker knew about their disclosures . . . mere guesses and speculation are all that the appellants present in support of a causal connection between these disclosures" and the adverse employment action) (physical precedent only). As we have explained in other contexts, "[g]uesses or speculation which raise merely a conjecture or possibility are not sufficient to create even an inference of fact for consideration on summary judgment." *Taylor v. N.I.L., Inc.*, 221 Ga. App. 99, 100 (470 SE2d 491)

[5] To the extent that Murray's affidavit contradicts her deposition testimony, the trial court was entitled to reject the affidavit under the *Prophecy* rule. See *Prophecy Corp. v. Charles Rossignol, Inc.*, 256 Ga. 27, 28 (1) (343 SE2d 680) (1986) ("if on motion for summary judgment a party offered self-contradictory testimony on the dispositive issue in the case, and the more favorable portion of [her] testimony was the only evidence of [her] right to a verdict in [her] favor, the trial court must construe the contradictory testimony against [her].").

(1996). Thus, Murray cannot establish a causal connection between her alleged protected activity and her termination, and she failed to make out a prima facie case of retaliation. Id. Accordingly, in the absence of any evidence that Studley knew of Murray's complaint before he fired her, Studley and APS are entitled to summary judgment on this ground.

### b. Claims against CHSPSC

The claims against CHSPSC are based on an agency theory – that Studley acted as an agent of CHSPSC. "Where the liability of a party is premised solely upon his vicarious liability for the tortious actions of an agent and judgment is entered for the agent, the party alleged to be vicariously liable is also entitled to judgment." *ITT Rayonier, Inc. v. McLaney*, 204 Ga. App. 762, 764 (1) (420 SE2d 610) (1992). In light of our conclusion that Murray has not established a prima facie case of retaliation, there is no liability on CHSPSC even if Studley were its agent.

### 2. Defamation

Murray argues that the trial court erred by granting summary judgment to all defendants on her claims for defamation. We disagree as to the statements Studley made to Dr. Joseph, but agree that there is a triable issue with respect to the statements Studley made to Dr. Davis.

14

To succeed on a claim for defamation, Murray must establish "(1) a false and defamatory statement concerning the plaintiff; (2) an unprivileged communication to a third party; (3) fault by the defendant amounting at least to negligence; and (4) special harm or the actionability of the statement irrespective of special harm." (Citation and punctuation omitted.) *Saye v. Deloitte & Touche, LLP*, 295 Ga. App. 128, 129-130 (1) (670 SE2d 818) (2008); see also OCGA § 51-5-1 (a). There is no dispute that the alleged statements – that Murray was on probation and that she treated Medicaid patients differently – were defamatory. See *Cottrell v. Smith*, 299 Ga. 517, 524 (II) (A) (788 SE2d 772) (2016). We thus turn to whether the statements were privileged.[6]

Georgia law recognizes two kinds of privileged communications, absolute and conditional. *Saye*, supra, 295 Ga. App. at 130 (1) (a) (citing OCGA §§ 51-5-7, 51-5-8). As is relevant here, communications are protected by qualified privilege when, inter alia, they are "[s]tatements made in good faith in the performance of a legal or moral private duty." OCGA § 51-5-7 (2). Where a party is asserting the defense of qualified privilege, the statement must be made in complete good faith with an

[6] Where, as here, the alleged defamation involves references to Murray's profession, damage is inferred. *Infinite Energy, Inc. v. Pardue*, 310 Ga. App. 355, 356 (1) (713 SE2d 456) (2011).

15

interest to uphold, and the statement must be properly limited in scope, made on a proper occasion, and made to a proper person. *Baskin v. Rogers*, 229 Ga. App. 250, 252 (4) (493 SE2d 728) (1997); *Sherwood v. Boshears*, 157 Ga. App. 542, 543 (278 SE2d 124) (1981). If the party making the defamatory statement did not act in good faith, privilege will not apply. *Baskin*, supra, 229 Ga. App. at 252 (4). In general, questions of privilege are for the jury to decide. *Cohen v. Hartlage*, 179 Ga. App. 847, 849 (348 SE2d 331) (1986).

Murray admits that in each case, Dr. Joseph and Dr. Davis initiated the conversation inquiring into the reasons for her termination.

a. Claims against Studley

(i) Studley's statements to Dr. Joseph

It is well-settled under Georgia law that "statements made in response to inquiries as to another person are deemed privileged when the inquirer is one naturally interested in [her] welfare." *Jones v. J. C. Penney Co. Inc.*, 164 Ga. App. 432, 433 (1) (297 SE2d 339) (1982) (citing *Whitley v. Newman*, 9 Ga. App. 89 (70 SE 686) (1910)). See also *Cochran v. Sears, Roebuck & Co.*, 72 Ga. App. 458, 462-463 (2) (34 SE2d 296) (1945) (employer disclosed to a child welfare worker charged with the care of the plaintiff's children that the plaintiff had been discharged because she

16

had contracted a venereal disease); OCGA § 51-5-7 (2) (statements made in a good faith performance of a moral private duty are privileged).

> In defamation cases involving an employer's disclosure to other employees of the reasons for a plaintiff's discharge, the general rule is that a qualified privilege exists where the disclosure is limited to those employees who have a need to know by virtue of the nature of their duties (such as supervisors, management officials, union representatives, etc.) and those employees who are otherwise directly affected either by the discharged employee's termination or the investigation of the offense leading to his termination.

(Citation omitted.) *Jones*, supra, 164 Ga. App. at 433 (1).

Applying the relevant case law to Murray's claims, Studley's statements to Joseph were privileged. As the chair of the OB/GYN Department, Joseph had reason to know about the termination of another doctor in his specialty, and Murray's termination would have impacted his work. *Jones*, supra, 164 Ga. App. at 433 (1). Accordingly, Studley made the defamatory statements in his performance of a private moral duty and his statements were therefore covered by privilege.

Nevertheless, Murray can defeat Studley's claim of privilege by showing that he acted with actual malice.[7] *Chaney v. Harrison*, 308 Ga. App. 808, 815 (1) (c) (708

---

[7] The trial court did not expressly address the issue of malice in its order.

17

SE2d 672) (2011). A statement is malicious when it is made "with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times Co. v. Sullivan*, 376 U S 254, 280 (84 SCt 710, 11 LE2d 686) (1964). Our Courts have held that "[m]alice must be actual and with evil intent." *Cooper-Bridges v. Ingle*, 268 Ga. App. 73, 77 (4) (601 SE2d 445) (2004). Studley bears the burden of negating Murray's claim of malice on a motion for summary judgment. *Sherwood*, supra, 157 Ga. App. at 543. If he produces such evidence to negate her claim, the burden shifts to Murray to come forward with evidence to show malice. Id. Conclusory allegations of malice are insufficient to meet this burden to raise a material issue that precludes summary judgment. Id.

Here, Studley has proffered evidence to show that he did not act with reckless disregard of the truth of the statements, as there was other evidence in the record to support each of the statements.[8] For example, there was testimony that Murray was often late and that she kept both her patients and her colleagues waiting; the CHSPSC vice president noticed that the practice volume was not what it should have been; and that Murray's productivity fell below the standards set out in her contract.

---

[8] Studley did not argue that his statements were true to defeat the claim of defamation; rather, we note only that there was some basis for Studley to believe the statements as we consider the issue of malice.

18

Thus, the burden shifted to Murray to show malice. *Sherwood*, supra, 157 Ga. App. at 544. Murray has not met her burden. Instead, she argues that Studley's reasons for terminating her were not supported by the evidence. However, her argument essentially recounts the ways in which the statements were false and defamatory without addressing whether they were made with actual malice and evil intent. Thus, she has not raised an issue of fact on malice, and summary judgment was proper on this defamation claim.

(ii) Studley's statements to Dr. Davis

Dr. Davis occasionally referred patients to Dr. Murray and was friendly with Murray socially. Studley denied making any comments to Davis about Murray's alleged disparate treatment of Medicaid patients.

Murray contends that Studley cannot simultaneously claim he acted in good faith and deny making the defamatory statements. Murray also argues that the inconsistencies in Studley's explanations for her termination show his lack of good faith.

A party can claim privilege while denying that he made the alleged defamatory statement by essentially defending in the alternative. See *Wertz v. Allen*, 313 Ga. App. 202, 205 (1) (721 SE2d 122) (2011) (defendant argued that any defamatory statement

19

was privileged, and, alternatively, that she made no defamatory statement). Moreover, although Murray disputes the truth of each of Studley's statements, there was some evidence in the record that supports the accuracy of these statements. Thus, Murray has not shown that Studley acted with a lack of good faith in making the statements.

Turning to the issue of privilege, we conclude that Murray has shown a genuine issue of material fact with respect to the statements Studley made to Davis. Although Davis referred patients to Murray and was friendly with her socially, on this record, we cannot conclude that Murray and Davis retained the type of relationship that permitted disclosure of this information to be protected by privilege as a matter of law. See *Thomas v. Hillson*, 184 Ga. App. 302, 303 (361 SE2d 278) (1987) ("[a] communication is qualified privileged when made in good faith in answer to one having an interest in the information sought, or if volunteered, when the person to whom the communication is made has an interest in it, and the person by whom it is made stands in such a relation to him as to make it a proper or responsible duty to give the information.") (citation and punctuation omitted); cf. *Jones*, supra, 164 Ga. App. at 433 (1) (statements privileged where employees had a need to know as a result of their duties and the employees were directly affected by the discharge). Nothing in Davis' job responsibilities would have been "directly affected" by

Murray's termination and there is no evidence that the two shared a close personal friendship. Compare *Jones*, supra, 164 Ga. App. at 433 (1). We thus conclude that Studley has not shown that the statements to Davis were privileged as a matter of law, and Studley was not entitled to summary judgment on this claim. Accordingly, we vacate the trial court's order in this regard, and remand the case for further proceedings on this issue.

b. Claims against APS and CHSPSC

Although we vacate the summary judgment order as to Studley on this defamation claim, the trial court properly granted summary judgment to APS and CHSPSC on both defamation claims. "The doctrine of respondeat superior does not apply in slander cases, and a corporation is not liable for the slanderous utterances of an agent acting within the scope of his employment, *unless* it affirmatively appears that the agent was expressly directed or authorized to slander the plaintiff." (Citations omitted; emphasis supplied.) *Lepard v. Robb*, 201 Ga. App. 41, 42 (1) (410 SE2d 160) (1991). Murray offered no evidence that either entity directly authorized Studley to make the defamatory statements. In the absence of any authorization giving Studley permission to make these statements, neither APS nor CHSPSC can be liable.

In summary, we conclude that the trial court properly granted summary judgment to all defendants on the retaliation claim, to all defendants on the defamation claim arising from the statements to Dr. Joseph, and to APS and CHSPSC on the defamation claim arising from the statements to Dr. Davis. We therefore affirm the trial court's order on these grounds. We reverse the trial court's order granting summary judgment on the defamation claims against Studley arising from his statements to Dr. Davis, and remand the case for further proceedings solely on this claim.

*Judgment affirmed in part; reversed in part; and case remanded. Doyle, P. J., and Reese, J., concur.*