AMY TOTENBERG, UNITED STATES DISTRICT JUDGE
*1338 I. INTRODUCTION
Plaintiffs, StopLoss Specialists, LLC ("StopLoss") and John Lewis ("Lewis") (collectively, the "Plaintiffs") bring this diversity action against Defendants, VeriClaim, Inc. ("VeriClaim") and Sedgwick Claims Management Services, Inc. ("Sedgwick") (collectively, the "Defendants") seeking damages and injunctive relief premised upon an allegedly defamatory email written and disseminated by one of VeriClaim's employees. See generally Amended Complaint ("Am. Compl.") (Doc. 12). Specifically, Plaintiffs allege various state statutory and common law causes of action, including Defamation/Defamation per se (Count I), violation of the Georgia Uniform Deceptive Trade Practices Act, O.C.G.A. § 10-1-370, et seq. (Count II), Tortious Interference with Business Relations (Count III), Punitive Damages (Count IV) and Attorney's Fees (Count V). See id.[1]
Presently before the Court are the parties' cross-motions for summary judgment in accordance with Fed. R. Civ. P. 56. See Notices of Motion (Docs. 70, 72). For the reasons that follow, Defendants' motion for summary judgment is DENIED and Plaintiffs' cross-motion for summary judgment is GRANTED, in part .
II. FACTUAL BACKGROUND
The following facts,[2] which are undisputed unless otherwise noted, are taken from the parties' Local Rule 56.1 Statements, the September 12, 2017 Declaration of Thomas Rongstad ("Rongstad Decl."), the July 14, 2017 Deposition of Thomas Rongstad ("Rongstad Dep."), the July 6, 2017 Deposition of StopLoss Specialists, LLC taken by John Lewis and the Deposition of John Lewis ("Lewis Dep."), the July 2, 2017 Deposition of Michael Cox ("Cox Dep."), the July 24, 2017 Deposition of Randell Whitehead ("Whitehead Dep."), the August 14, 2017 Deposition of Scott Chambers ("Chambers Dep."), the Deposition of Jennifer Hoyal ("Hoyal Dep.") and the Deposition of Nathan Brooks ("Brooks Dep.") as well as the exhibits attached thereto.[3]
A. StopLoss' Business Model
StopLoss Specialists, LLC ("StopLoss") provides emergency mitigation and remediation services following the occurrence of catastrophic events such as hurricanes, tornadoes, flooding and fire. Plaintiffs' Statement of Undisputed Material Facts ("Pls.' 56.1 Statement") ¶ 1. StopLoss is jointly owned by John Lewis and his wife. Id. The scope of work that StopLoss performs includes "drying a structure, preparing it for rebuild [as well as] decontaminating a structure from mold, mercury, and even Ebola." Id. Therefore, where StopLoss is contracted to perform mitigation and remediation services their team "decontaminate[s], *1339 clean[s] [and] prepare[s] buildings and commercial structures for rebuild." Id. StopLoss maintains a permanent workforce of approximately eight employees "which it can supplement with a temporary workforce consisting of potentially hundreds of personnel provided for, and vetted by, temporary labor providers ...." Id. ¶ 2. Approximately ninety-five percent of StopLoss' business is generated from referrals. Id. ¶ 5. Generally, the owner of a damaged property retains StopLoss directly. Id.
B. The 2014 Escambia County Rainstorm
On April 29-30, 2014, a severe rainstorm impacted Escambia County (Pensacola), Florida. Id. ¶ 7. During this 24-hour period, 22 inches of rain fell, resulting in severe flooding. Id. Nineteen Escambia County buildings, including the Sheriff's offices and the county jail, suffered flood damage. Id. ; Defendants' Statement of Undisputed Material Facts ("Defs.' 56.1 Statement") ¶ 1. While the loss attributable to the flooding alone totaled $8 million, an explosion during the flood caused further damage such that the overall loss totaled between $45-50 million. Pls.' 56.1 Statement ¶ 8; Defs.' 56.1 Statement ¶ 2.
Following the storm, Escambia County, which had utilized StopLoss' remediation services during a previous weather event in 2012, again retained StopLoss to "be its primary mitigation contractor." Pls.' 56.1 Statement ¶ 9; see also Defs.' 56.1 Statement ¶ 26 ("StopLoss was given this job as part of its existing contractual relationship with Escambia County, and StopLoss estimated the project would cost $1.83 million"). StopLoss' primary point-of-contact with Escambia County was David Wheeler, the county's Facilities Director. Pls.' 56.1 Statement ¶ 9. After being retained, John Lewis contacted Nathan Brooks ("Brooks"), "president and majority owner of SouthernCAT" in order to offer Brooks the "opportunity to joint venture with StopLoss on the [Escambia County] project." Id. ¶ 10. In response, "Brooks traveled from Chicago to Pensacola that same day." Id. StopLoss' eight permanent employees all were assigned to the Escambia County project and were augmented by seasonal contract employees who performed the actual physical remediation efforts. Defs.' 56.1 Statement ¶ 21. These seasonal employees were "drawn from a pool of about 300 workers supplied by various companies, including OMI, Legacy, and Russell Construction." Id. ¶ 22.
Although Escambia County had retained StopLoss directly, it was nevertheless "insured for at least part of the ... [l]oss" Defs.' 56.1 Statement ¶ 3. After being notified of the loss, Escambia County's insurance carriers subsequently hired Defendant VeriClaim to "serve as the insurance adjuster." Id. ¶ 4.[4] VeriClaim, in turn, assigned specific personnel to adjust the loss associated with the Escambia County rainstorm, including Tom Rongstad "(Rongstad"), who served as a general claims adjuster. Id. ¶ 7. Rongstad, a licensed insurance adjuster, possessed 28 years of experience in the insurance industry and had maintained a relationship with VeriClaim "or companies it acquired since 1992." Id. ¶¶ 8-10; Pls.' 56.1 Statement ¶ 14. As a general adjuster assigned to the Escambia County loss, Rongstad "represented the insurance companies" and, in that capacity, "evaluated the process of remediation and repairs, evaluated problem areas, and sought to apprise, through *1340 VeriClaim, the status of the loss and its remediation." Defs.' 56.1 Statement ¶¶ 12-13. Thus, Rongstad "made rounds each day to check on the progress of the remediation by vendors, often visiting buildings under repair multiple times in the same day." Id. ¶ 14. As an insurance adjuster for VeriClaim, Rongstad reported to Scott Chambers, who was the lead adjuster in charge of the Escambia County loss and who, in turn, reported directly to the insurance carriers. Pls.' 56.1 Statement ¶ 13.
After being retained as the insurance adjuster, VeriClaim, upon obtaining authorization, engaged Madsen Kneppers & Associates ("MKA") to "clerk the works" for the Escambia County loss. Defs.' 56.1 Statement ¶¶ 15-16. In this capacity, MKA was tasked with "visit[ing] all of the locations where mitigation was occurring, count the employees on the property, count the equipment that is running, record the hour meters, and then compare its observations against vendor invoices to ensure accuracy." Id. ¶ 16.
C. The Daily 10:00 AM Meetings
In light of the scope of the project, during the first two to three weeks following the storm, a daily 10:00 a.m. meeting was held in order to discuss the "ongoing challenges and develop avenues to overcome those challenges...." Pls.' 56.1 Statement ¶ 17. Rongstad elaborated that the challenges faced included "[h]ow to restore 19 buildings and the services they provide. Inmate housing, juvenile detention housing[,] [w]hat to do with these people, where to put them ... how many counties over are we going to use? This was a huge challenge. We had over 600 inmates displaced [and] [t]hat was a huge challenge, to find housing for 600 inmates." Rongstad Dep. at 35-36. The meetings also served as a forum "to talk about what had been accomplished and what was going to be accomplished." Brooks Dep. at 26.
Although the overall attendees at the daily meeting "changed on a daily basis," Rongstad Dep. at 35, those persons who typically attended included: Tom Rongstad (VeriClaim), Michael Watts (Escambia County), Jim Flee (Insurance Broker), Michael Cox (MKA), John Lewis (StopLoss), George Caras (StopLoss), Jennifer Hoyal (StopLoss/SouthernCAT) and Nathan Brooks (StopLoss/SouthernCAT). Pls.' 56.1 Statement ¶ 18. In addition, sometimes Escambia county Commissioners would attend the daily meeting as well. Id. ¶ 18. Generally, there were about twenty total attendees at the daily meeting. Rongstad Dep. at 35.
Notwithstanding the overarching purpose of the daily meeting, Jennifer Hoyal (StopLoss/SouthernCAT), who attended the daily meeting during the first week of the flood response, Hoyal Dep. at 38, stated that in her view the meeting
was like walking into a buzz saw every time we went in ... where it felt like we were being gunned for ... Usually those meetings are productive. There's a productive element to the meeting ... [but] [t]he meetings just didn't play out that way. It was more we walk in and there was a lot of accusations thrown about what we were or weren't getting done and then we would say, no, that is complete ... It was a very abrasive ... very confrontational [ ] and we really didn't understand why. We had never worked with [Rongstad] before [and] we didn't know why he was so confrontational with us and really seemed to be trying to get us thrown off the project is what it seemed like [to me].
Id. at 19-20. In addition, Nathan Brooks (StopLoss/SouthernCAT), when asked how he would "describe Mr. Rongstad's demeanor when he interacted with you and John Lewis at [the daily] meetings" stated that Rongstad appeared "[p]ut out, disgusted, *1341 aggravated" and that he was not able to "think of one time that [Rongstad] said something reasonable or nice or kind." Brooks Dep. at 32.
However, Michael Cox (MKA), when asked to describe the interactions between Rongstad and John Lewis during the daily meeting, stated that the exchanges between the two "were civil" but that "this was an extremely tense situation [and] [t]here was a lot of pressure to perform for everyone involved, and so it was a very intense situation in my opinion." Cox Dep. at 25. In addition, Cox stated that he did not "recall any arguing or ... foulness or anything like that [but that he] just recall[ed] there was a bit of tension in the air because everyone was under a lot of pressure." Id. Likewise, Cox noted that "Tom Rongstad expressed a lot of frustration during this process with not only StopLoss but contractors, with the County [and] with brokers [because] [t]here was a lot of stress going on." Id. at 33.
According to Nathan Brooks (StopLoss/SouthernCAT) and John Lewis (StopLoss), during the daily meeting, Rongstad accused StopLoss of: (1) not having enough employees; (2) having too many employees; (3) not having enough equipment and (4) not having completed certain tasks. Pls.' 56.1 Statement ¶¶ 24-27. However, Lewis was given a chance to respond to these allegations. Lewis Dep. at 76 (stating that "I told [Rongstad] I didn't know where his information was being gathered from, but I had more than sufficient manpower and more than sufficient equipment to do every loss that they had simultaneously ... [s]o I rebutted [Rongstad's allegations] straight away."). In addition to these accusations, during one daily meeting Rongstad "displayed on his computer a picture of 50-60 StopLoss employees standing/sitting [idle], apparently doing nothing [and] Lewis had to explain to Rongstad and the other [meeting] attendees, including Escambia County, that StopLoss personnel take breaks and lunch at the same time, and the employees in the picture were on break." Id. ¶ 28.
Although Rongstad, who was employed by VeriClaim, had "no authority to remove StopLoss from the project," meeting attendees who were affiliated with StopLoss concluded that Rongstad's remarks and behavior were levied in order "to get the County to fire StopLoss and bring in a different company." Id. ¶ 30; see Hoyal Dep. at 44 (stating that she remembered Rongstad stating during a meeting that "I've got people who can get this done, they're not getting it done, kind of in [ ] general. I don't remember specifically the words he used, but that was generally what he said....").
In addressing what Rongstad perceived to be StopLoss' inadequate level of equipment, he stated that "[a]bsolutely. They did not" and added that he "had several" other companies who possessed the necessary equipment including "BELFOR, Complete DKI [and] SERVPRO." Rongstad Dep. at 37. Rongstad clarified that "they all had generators, and they were willing to drop them off [with] me at any time to help StopLoss do their job, as they were hired to do."Id. Nevertheless, both Brooks and Lewis interpreted Rongstad's remarks as "offer[ing] up his own solution, another company." Brooks Dep. at 31; see Lewis Dep. at 130 (stating that Rongstad recommended "a competitor, a much larger competitor, in an open meeting with all the participants we described earlier."); id. at 129 (stating that he perceived Rongstad's accusations and comments as being made in order to "try[ ] to get [StopLoss] thrown off the job").
D. Rongstad's Inspections of the Sheriff's Warehouse
During the eighth or ninth day of the drying process, Rongstad visited the Sheriff's Warehouse. Defs.' 56.1 Statement *1342 ¶ 39.[5] The Sheriff's Warehouse consisted of a concrete floor. Id. ¶ 40. By this point in the drying process, Rongstad had "viewed the building as largely done" such that he was curious at the "magnitude of people inside and outside the building." Id. ¶ 41. Upon entering the building, Rongstad observed that "the floor appeared to be wet." Id. ¶ 42. After making this observation, Rongstad "asked a StopLoss employee ... why the concrete was still wet so long into the remediation and was told that 'water must be wicking up from the ground through the concrete.' " Id. ¶ 43. As Rongstad had not previously heard of this type of issue, he "decided to visit [the building] more frequently to learn about it." Id. ¶ 44.
The following morning, Rongstad returned to conduct a further inspection of the Sheriff's Warehouse as well as the Evidence Room." Id. ¶ 45. Upon entering the Sheriff's Warehouse, Rongstad "witnessed one [StopLoss] worker dumping water from a five-gallon bucket onto the floor, two other workers using squeegees to move the water, and a magnitude of people in the room." Id. ¶ 48; see Rongstad Dep. at 50-54; Lewis Dep., Exhibit ("Ex.") 6 (sign-in sheet for May 10, 2014 reflecting 28 workers assigned to the Sheriff's Warehouse and Evidence Room building). After making this discovery, Rongstad "concluded that the concrete was getting wet again because people were pouring water on it" as opposed to "water wicking up through concrete as had been represented to him" the previous day. Defs.' 56.1 Statement ¶ 50. According to Rongstad, the bucket's contents "appeared to be clear water, with no soap bubbles or smell." Id. ¶ 51. However, despite having a camera on hand in order to document his observations, Rongstad did not take a photo of what he observed because he "didn't want to document what [he] saw" because he "was shocked" and it "[w]as too horrible to document [ ] with a camera." Rongstad Dep. at 50. In addition, he did not ask any of the StopLoss employees what they doing because he "became extremely disappointed" and simply "turned around and left." Id. at 53. At some point after leaving the Sheriff's Warehouse, Rongstad initiated what he perceived to be an investigation by "[r]eporting to MKA, asking if [ ] anybody had seen [the incident] ... expressing what [he] saw to MKA, and then delegating [to] them [the task of] finish[ing] the investigation in order to stop [the incident] from happening over and over again." Rongstad Dep. at 74.
E. Rongstad Composes and Disseminates the May 10, 2014 Email
On May 10, 2014, following his observations during his inspection of the Sheriff's Warehouse, Rongstad drafted and disseminated an email "to members of his team and MKA describing the event and offering his opinion of what he had observed." Defs.' 56.1 Statement ¶ 63. The text of the email reads as follows:
Team,
This will confirm documentation exists in several forms:
1. Stop Loss is Dumping water into dried buildings.
2. Stop Loss then employs 12 temp labors [sic. ] to push it around on the concrete slab with squeegees.
This appears to be Insurance Fraud.
An investigation has been initiated.
Good Catch TEAM!!
*1343 Sorry we have to deal with this also.
Rongstad Dep., Ex. 6. The email was sent to eight persons involved with the Escambia County loss. Defs.' 56.1 Statement ¶ 66. These persons included: (1) Hayden Ross, an MKA part-time analyst and administrative assistant who reviewed StopLoss' invoices as part of MKA's oversight of the Escambia County project; (2) Jennifer Ludvik, an MKA office manager who "assisted Mr. Cox in communications to all parties" and who was "part of the clerking team for the Escambia County project;" (3) Michael Cox, MKA's lead insurance adjuster assigned to the Escambia County project; (4) Michael Watts, acting director of risk management for Escambia County; (5) David Wheeler, Escambia County's director of facilities; (6) Jim Flee of Whitman & Whitman, the insurance broker or agent for Escambia County; (7) Mr. Mobley, one of Escambia County's facility managers; and (8) Scott Chambers, the lead adjuster reporting to the insurance carriers. Id. Of the eight recipients, only Scott Chambers responded to Rongstad's email. Id. ¶ 74.
According to Rongstad, the email reflects his "opinion, informed by twenty-eight (28) years as a claims adjuster, that StopLoss was dumping water into a dried building for the purpose of performing unnecessary work so that it could increase its billings [and] [a]s a claims adjuster, [he] was concerned" and, on that basis, "initiated an investigation [by] asking MKA clerks whether they had seen anything similar and making them alert to this issue." Rongstad Decl. ¶ 17.
Although Rongstad's email references the existence of confirmatory documentation "in several forms" in the first line, during his deposition, he testified that he was unable to remember "what documentation I was referring to in that sentence" but that he is certain documentation existed "because [he] wrote the [ ] sentence." Rongstad Dep. at 65, 102. Rongstad was also unable to recall the form any such documentation may have taken. Id. ; see also Chambers Dep. at 31 (stating that he never asked Rongstad what documentation existed since he didn't "think there was documentation" but that it "was something that [Rongstad] visually saw").
Notwithstanding that in his email Rongstad refers to 12 laborers engaged in the activity of pushing water around on the concrete slab with squeegees, during his deposition Rongstad confirmed there were only "two [ ] laborers with squeegees" and that were "other people in the building." Rongstad Dep. at 71.
F. Rongstad Discusses the Sheriff's Warehouse Incident with MKA
At some point either prior to or shortly after the May 10, 2014 email was sent, Rongstad met with individuals from MKA, including Michael Cox and Randell Whitehead, in order to discuss his observations. See Rongstad Dep. at 66-70.[6] During this *1344 meeting "MKA's Randy Whitehead told Mr. Rongstad that he had seen StopLoss doing the same thing at the Leonard Street Garage, another building that StopLoss was remediating in the Escambia County Loss." Defs.' 56.1 Statement ¶ 55. Indeed, Whitehead stated that he saw "StopLoss personnel pouring water out of a bucket onto a floor and spreading it around in the Leonard Street Garage." Id. ¶ 56. Although Whitehead recalls that Rongstad was with him at the Leonard Street Garage, Whitehead Dep. at 53, Rongstad only recalls being told about Whitehead's observation at the Leonard Street Garage but not actually witnessing it himself. See Rongstad Dep. at 66 (stating that at the time he composed the email he "had knowledge that this action of dumping water into a building was occurring in more than one building," that the other building in question was the Leonard Street Garage and that this knowledge consisted of him being "told that by the clerk of MKA on this day that I penned this email").
During this brief meeting, Rongstad also reported what he had spoken to Michael Cox and instructed him to "manage whatever [MKA] needed to do to stop what I perceived as intentional actions of making the concrete wet" and to "rectify that situation however [MKA] had to ... and [Rongstad] did not bother with it any further after that [conversation]." Rongstad Dep. at 54. In response, Michael Cox told Rongstad that he "would look into it" but also reminded Rongstad that "at the end of the day the audit will reveal just about anything that [Rongstad] should be concerned about." Cox Dep. at 39. At some point after this brief discussion, Cox "spoke with a couple of [his] guys in the field and asked them, very casually ... did [they] see anything weird going on; and as I recall it, I was told no." Id. at 39-40. However, Cox did not perceive Rongstad's request as a directive to initiate an investigation into the incident. Id. at 37. In addition, despite Rongstad's concern, Cox's view was that "StopLoss was probably engaged in sanitation" since "[d]uring the sanitation process ... sometimes you mix a sanitizer in with the water and use that solution ... It's not unusual, that method. There are better methods, but sometimes that's the method that's used and that's what I took it as." Id. at 34. Cox also noted that it "did not strike me as reasonable that [StopLoss] would intentionally reintroduce water if there wasn't a purpose for it" since Cox was aware that "StopLoss was under a lot of pressure to get these buildings ready for reconstruction." Id. at 34.
G. StopLoss Becomes Aware of the Email
On July 7, 2014, almost two months after Rongstad had composed the May 10, 2014 email, Michael Lewis, Mr. Caras (another StopLoss employee) and Mr. Wheeler (Escambia County) had a meeting during which Mr. Wheeler referenced the May 10, 2014 email. Defs.' 56.1 ¶ 81. Despite learning of the email's existence, StopLoss did not open an inquiry or otherwise investigate the statements made by Rongstad in the May 10, 2014 email. Id. ¶ 84; see Lewis Dep. at 94-95 (when asked whether he did "anything to investigate whether Rongstad was right about what he saw" Lewis answered "[w]ell, no, because ... I knew factually with me overseeing the project that for days and weeks we pushed water around with squeegees" and on that basis he "would have no reason to" investigate).
*1345 However, Lewis denies that if such activity was engaged in it was done on a fraudulent basis since "we're not crooks" and "we don't steal from our clients ever." Lewis Dep. at 101. Rather, Lewis agreed with the view that the activity described in Rongstad's email, to the extent it occurred, could have been engaged in for the purposes of remediation, since pursuant to the "IICRC S-500, which is the industry standard for protocols in cleaning black water contaminants ... we add clean water to dried buildings on occasion; often, in fact." Id. at 101-02.
Although Lewis learned of the email's existence on July 7, 2014, he was not provided with a copy of it until August 26, 2015, after making several requests to David Wheeler. Pls.' 56.1 Statement ¶ 59. In addition, according to Lewis, until he finally received a copy he was not entirely sure the email existed and thought Wheeler had just been "screwing with" him. Id. ¶ 60
H. The Decontamination Process Involves the Application of Clean Water to a Dry Surface
The Institute of Inspection, Cleaning and Restoration Certification ("IICRC") has published the IICRC S500 "Standard Reference Guide for Professional Water Damage Restoration." Id. ¶ 53. According to Rongstad, this publication is the "frontrunner of standards that mitigation companies have placed as their goal to achieve." Id. Rongstad's May 10, 2014 email, which described pouring clean water on a dry floor, is one method set forth by IICRC S500 for the "purpose of sanitizing and decontaminating dried areas previously flooded with Category 3 water, also known as 'black water.' " Id. ¶ 54, Ex. 7 (excerpt of IICRC S500); see also Brooks Dep. at 36-37 (stating that "contractors will pressure wash everything to get all the contaminants out ... [and that] other methods [include using] buckets of water and water hoses" while also recognizing that "introducing water to a previously dried structure in order to decontaminate it ... [is not unusual] [since] that's how you do it. That's exactly how you do it. Clean water to clean even a dirty kitchen floor"); Hoyal Dep. at 45-46 (noting that both pressure washing and using buckets of water on the floor are both "acceptable [methods for decontamination] depending on the situation" since the goal is to "recreate the penetration of materials ... to make sure that your decontamination solution gets everywhere that the floodwater was and you can use either [method]. Either is acceptable.").
III. STANDARD OF REVIEW
This Court may grant summary judgment only if the record shows "that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is genuine if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party. Anderson v. Liberty Lobby, Inc. , 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A factual dispute is material if resolving the factual issue might change the suit's outcome under the governing law. Id. The motion should be granted only if no rational fact finder could return a verdict in favor of the non-moving party. Id. at 249, 106 S.Ct. 2505.
When ruling on the motion, the Court must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in the non-moving party's favor. Reeves v. Sanderson Plumbing Prods., Inc. , 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). The moving party need not positively disprove the opponent's case; rather, the moving party must establish *1346 the lack of evidentiary support for the non-moving party's position. Celotex Corp. v. Catrett , 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party meets this initial burden, in order to survive summary judgment, the non-moving party must then present competent evidence beyond the pleadings to show that there is a genuine issue for trial. Id. at 324-26, 106 S.Ct. 2548. The essential question is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson , 477 U.S. at 251-52, 106 S.Ct. 2505.
IV. DISCUSSION
A. Defamation / Defamation per se
1. Applicable Law
Under Georgia law,[7] libel is statutorily defined as the "false and malicious defamation of another, expressed in print, writing, pictures, or signs, tending to injure the reputation of the person and exposing him to public hatred, contempt, or ridicule." O.C.G.A. § 51-5-1(a). To establish a viable claim sounding in defamation a plaintiff must plead and prove the following four elements: "(1) a false and defamatory statement concerning the plaintiff; (2) an unprivileged communication to a third party; (3) fault by the defendant amounting at least to negligence; and (4) special harm or the actionability of the statement irrespective of special harm." Smith v. DiFrancesco , 341 Ga. App. 786, 787-88, 802 S.E.2d 69, 72 (2017), cert. denied (Dec. 11, 2017); Wertz v. Allen , 313 Ga. App. 202, 205, 721 S.E.2d 122, 126 (2011). "Although as a general rule the question whether a particular communication is defamatory is for the jury, if the statement is not ambiguous and reasonably can have only one interpretation, the question of defamation is one of law for the court." Speedway Grading Corp. v. Gardner , 206 Ga. App. 439, 441, 425 S.E.2d 676, 678 (1992).
In order to satisfy the first element, the alleged defamatory statement must be shown to be false, and, as such, "a defamation action will lie only for a statement of fact" since "an opinion or subjective assessment, as to which reasonable minds could differ, cannot be proved false." Cottrell v. Smith , 299 Ga. 517, 523, 788 S.E.2d 772, 781, reconsideration denied (July 25, 2016), adopted , (Ga. Super. 2016), and cert. denied , --- U.S. ----, 137 S.Ct. 648, 196 L.Ed.2d 523 (2017) (citing Gettner v. Fitzgerald , 297 Ga. App. 258, 261, 677 S.E.2d 149, 153 (2009) ); see Bryant v. Cox Enterprises, Inc. , 311 Ga. App. 230, 234, 715 S.E.2d 458, 463 (2011) ("[A]s a general rule, statements of pure opinion are not capable of being proven false and cannot form the basis of a defamation claim."). Therefore, as a general matter, "a plaintiff who claims that a published opinion defamed him will generally be unable to carry his burden of proving the essential element of falsity." Cottrell , 299 Ga. at 523, 788 S.E.2d at 781 ; Bryant , 311 Ga. App. at 234, 715 S.E.2d at 463. Nevertheless, the law is clear that "[t]here is ... no wholesale defamation exception for anything that might be labeled opinion." Cottrell , 299 Ga. at 523, 788 S.E.2d at 781 ; Gettner , 297 Ga. App. at 261, 677 S.E.2d at 154. Rather, "[a]n opinion can constitute actionable defamation if the opinion can reasonably be interpreted, according to the context of the entire writing in which the opinion appears,[8] to state or *1347 imply defamatory facts about the plaintiff that are capable of being proved false." Cottrell , 299 Ga. at 523, 788 S.E.2d at 781 ; Gettner , 297 Ga. App. at 261, 677 S.E.2d at 154 ; Bryant , 311 Ga. App. at 235, 715 S.E.2d at 464. As the Supreme Court astutely observed:
If a speaker says, "In my opinion John Jones is a liar," he implies a knowledge of facts which lead to the conclusion that Jones told an untruth. Even if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact. Simply couching such statements in terms of opinion does not dispel these implications; and the statement, "In my opinion Jones is a liar," can cause as much damage to reputation as the statement, "Jones is a liar." As Judge Friendly aptly stated: "[It] would be destructive of the law of libel if a writer could escape liability for accusations of [defamatory conduct] simply by using, explicitly or implicitly, the words 'I think."
Milkovich v. Lorain Journal Co. , 497 U.S. 1, 18-19, 110 S.Ct. 2695, 2705-06, 111 L.Ed.2d 1 (1990) (alterations in original). Whether the statement is one of fact or opinion and whether a statement of fact is susceptible to defamatory interpretation are questions of law for the court. Turner v. Wells , 879 F.3d 1254, 1262-63 (11th Cir. 2018). As defamatory statements must be false to be actionable, "[t]ruth is a complete defense to alleged libel or slander." Cottrell , 299 Ga. at 523, 788 S.E.2d at 781 (citing O.C.G.A. § 51-5-6"The truth of the charge made may always be proved in justification of an alleged libel or slander.").
The second element requires both that the statement is not privileged and that it is published to a third party. See Smith , 341 Ga. App. at 787-88, 802 S.E.2d at 72. Significantly, "whether a statement is privileged is a separate and distinct legal question from whether the statement was published." Saye v. Deloitte & Touche, LLP , 295 Ga. App. 128, 133, 670 S.E.2d 818, 823 (2008) (citing Elder v. Cardoso , 205 Ga. App. 144, 146-147(2), 421 S.E.2d 753 (1992) ("[T]he existence of a conditional privilege is not the legal equivalent of the non-existence of actionable publication.") ).
"Publication of the statement is imperative and, without it, the defamation claim fails." Saye , 295 Ga. App. at 130, 670 S.E.2d at 821 (citing O.C.G.A. § 51-5-1(b)"The publication of the libelous matter is essential to recovery."). Although traditionally a publication was "achieved by communicating a defamatory statement to anyone other than the person being defamed," see O.C.G.A. § 51-5-3, there has arisen over time "[a]n exception to that broad definition ... and it now excludes communications that are intracorporate, or between members of unincorporated groups or associations, and ... heard by one who, because of his/her duty or authority has reason to receive ... information." Saye , 295 Ga. App. at 133, 670 S.E.2d at 823 (second and third ellipsis in original); see Koly v. Enney , 269 F. App'x 861, 864 (11th Cir. 2008) (unpublished) (recognizing that "Georgia law provides a well-established exception to the broad definition of publication[,] when the communication is intracorporate, or between members of unincorporated groups or associations, and is heard by one who, because of his/her duty or authority has reason to receive the information, there is no publication..."); Stringfield v. IAP World Servs., Inc. , 784 F.Supp.2d 1378, 1384 (S.D. Ga. 2011) ("[W]hen the communication is intracorporate, and is received in the course of a duty or by virtue of an *1348 authority, there is no publication.") (quoting Atlanta Multispecialty Surgical Assocs., LLC v. Dekalb Med. Ctr., Inc. , 273 Ga. App. 355, 357, 615 S.E.2d 166 (2005) ); see also Wright v. Atlanta Pub. Sch. , No. 1:17-CV-975, 2018 WL 1249312, at *7 (N.D. Ga. Feb. 15, 2018), report and recommendation adopted , No. 1:17-CV-975, 2018 WL 1247879 (N.D. Ga. Mar. 8, 2018) ("A corporation is not held responsible for defamation if the slanderous or libelous material was communicated from one corporate agent to another who has reason to receive the information because of her duty or authority."). "The legal fiction that no publication has occurred when the above criteria are met is based on the sentiment that statements by either in the hearing of the other concerning such matters are the legal equivalent of speaking only to one's self." Saye , 295 Ga. App. at 133, 670 S.E.2d at 823 ; Hardware, Ltd. v. Kuehne & Nagel, Inc. , 205 Ga. App. 94, 96-97, 421 S.E.2d 550 (1992) ("It is well settled that a communication made by one corporate agent to another is not publication in the legal sense").
In the event a publication is established, the next inquiry focuses on whether the communication is nevertheless privileged. See Saye , 295 Ga. App. at 133, 670 S.E.2d at 823. "Georgia law recognizes two different kinds of privileged communications, absolute and conditional." Wertz , 313 Ga. App. at 206, 721 S.E.2d at 126 ; Hayes v. Irwin , 541 F.Supp. 397, 432-33 (N.D. Ga. 1982), aff'd , 729 F.2d 1466 (11th Cir. 1984), and aff'd sub nom. Hayes v. Irwin Trading , 729 F.2d 1466 (11th Cir. 1984) ("[P]rivileged communications are divided into two classes: absolute and conditional (qualified)."). While "communications which are afforded an absolute privilege cannot form the basis of a defamation action, regardless of the falsity of the statements or the speaker's malicious intent; conditionally privileged statements, on the other hand, are actionable upon a showing of malice." Wertz , 313 Ga. App. at 206, 721 S.E.2d at 126 ; Dockens v. DeKalb Cty. Sch. Sys. , No. 1:07-CV-1345, 2009 WL 10668308, at *31 n.38 (N.D. Ga. Feb. 12, 2009), report and recommendation adopted , No. 1:07-CV-1345, 2009 WL 10670921 (N.D. Ga. Mar. 27, 2009) ; see Hayes , 541 F.Supp. at 433 ("The characteristic feature of an absolute privilege, as distinguished from a conditional privilege, is that in the former, the question of malice is not open; all inquiry into good faith is closed.").
Georgia law includes nine explicitly defined categories of statements which qualify for the conditional privilege. See O.C.G.A. § 51-5-7 ; Wertz , 313 Ga. App. at 206, 721 S.E.2d at 126. In order to establish that a statement is conditionally privileged, the party charged with making the otherwise defamatory statement must show that "(a) she acted in good faith; (b) in connection with an interest to be upheld; (c) the statement was properly limited in its scope and occasion; and (d) publication was made to proper persons." Smith , 341 Ga. App. at 790, 802 S.E.2d at 73 ; see Hammer v. Slater , 20 F.3d 1137, 1141 (11th Cir. 1994) ("Georgia cases have held that in order to come within the purview of [O.C.G.A.] section 51-5-7, the defendant must show, among other things, " 'good faith, an interest to be upheld, a statement properly limited in its scope, a proper occasion, and publication to proper persons.' ") (citing Camp v. Maddox , 93 Ga. App. 646, 649, 92 S.E.2d 581, 584 (1956) ). However, even if established, the protection afforded by the conditional privilege may nevertheless be forfeited where "the privilege is used merely as a cloak for venting private malice and not bona fide in promotion of the object for which the privilege is granted[.]" Hammer , 20 F.3d at 1141 (quoting O.C.G.A. § 51-5-9 ). Whether the privilege is lost under this statutory *1349 provision generally turns upon "whether the allegedly defamatory matter was uttered with knowledge that it was false or reckless disregard for whether it was true or false." Id. at 1142 (citing cases); see Wertz , 313 Ga. App. at 207, 721 S.E.2d at 127 (recognizing that "[t]he effect of [a conditional] privilege is to require the plaintiff to prove actual malice" and finding that summary judgment in defendant's favor was proper where "the record ... fails to rebut the existence of a conditional privilege with evidence of actual or express malice"); see also Smith v. Henry , 276 Ga. App. 831, 833, 625 S.E.2d 93, 96 (2005) ("Because Smith presented evidence that he acted in good faith and without malice, the burden shifted to Henry to point to specific evidence of malice on his part. This she did not do. Malice to avoid qualified privilege must be actual and with evil intent. In order to prove actual malice, Henry was required to show that Smith either knew his statement was false or made it with reckless disregard of the truth."). Moreover, "Georgia courts have repeatedly held that the issue of malice in conditional privilege cases is generally a jury issue, inappropriate for summary judgment." Hammer , 20 F.3d at 1143 (citing cases).
As to establishing fault, the third element, so long as plaintiff is a private individual he need only "prove that defendant acted with ordinary negligence." Gettner , 297 Ga. App. at 263, 677 S.E.2d at 155 ; Carbone v. Cable News Network, Inc. , No. 1:16-CV-1720, 2017 WL 5244176, at *8 (N.D. Ga. Feb. 15, 2017) ("If Plaintiff is a private figure ... he need only show that [defendant] acted with ordinary negligence."). In the event Plaintiff is a public figure, a heightened standard applies which requires proof, "by clear and convincing evidence that the defendant acted with actual malice." Gettner , 297 Ga. App. at 263, 677 S.E.2d at 155 ; 1524948 Alberta Ltd. v. Lee , No. 1:10-CV-02735, 2011 WL 2899385, at *9 (N.D. Ga. July 15, 2011). "The question whether a particular person is a public figure is a question of law to be decided by the court." Holt v. Cox Enterprises , 590 F.Supp. 408, 411 (N.D. Ga. 1984) ; Gettner , 297 Ga. App. at 263, 677 S.E.2d at 154-55.
In order to satisfy the final element, a plaintiff must prove special damages, "such as loss of employment, income, or profits." Johnson v. Citimortgage, Inc. , 351 F.Supp.2d 1368, 1377 (N.D. Ga. 2004) ; see Simon v. Shearson Lehman Bros. , 895 F.2d 1304, 1311 (11th Cir. 1990) ("Special damage is 'the loss of something having economic or pecuniary value,' while general damages include 'impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering.' ") (quoting Restatement 2d Torts § 575, comment b and Gertz v. Robert Welch, Inc. , 418 U.S. 323, 350, 94 S.Ct. 2997, 3012, 3013, 41 L.Ed.2d 789 (1974) ). Thus, it follows that "[t]he nature of special damages are such as really took place. They are not to be implied but are to be specifically proved." Simon , 895 F.2d at 1318. Where Plaintiff fails to establish special damages through submission of competent evidence and where the alleged defamatory communication does not otherwise constitute defamation per se the claim will fail as a matter of law. See, e.g. , Latson v. Boaz , 278 Ga. 113, 115, 598 S.E.2d 485, 487 (2004) (finding that the "trial court correctly ruled that [defendant] was entitled to summary judgment" where plaintiff "offered no evidence of special damages, an essential element of their claim...."); Garner v. Acad. Collection Serv., Inc. , No. CIV. A.3:04-CV-93, 2005 WL 643680, at *4 (N.D. Ga. Mar. 11, 2005) ("Plaintiff's defamation claim fails, however, because she has not alleged, and it cannot be reasonably inferred from her Complaint, that she has suffered any special damages.").
*1350 However, a plaintiff need not affirmatively prove special damages if the alleged communication at issue constitutes libel per se since "[w]here a statement is defamatory per se , the element of damages is inferred." Smith , 341 Ga. App. at 789, 802 S.E.2d at 72 ; see Cottrell , 299 Ga. at 523, 788 S.E.2d at 781 ("Because the jury in this case found no special damages, a verdict for defamation is sustainable only if there was defamation per se...."); Walker v. Walker , 293 Ga. App. 872, 876, 668 S.E.2d 330, 336 (2008) ("Because defamation concerning trade, office, or occupation is defamation per se, damage is inferred[.]").
2. Application to the Facts
As set forth previously, a claim sounding in defamation requires that a plaintiff plead and prove the following four elements: "(1) a false and defamatory statement concerning the plaintiff; (2) an unprivileged communication to a third party; (3) fault by the defendant amounting at least to negligence; and (4) special harm or the actionability of the statement irrespective of special harm." Smith , 341 Ga. App. at 787-88, 802 S.E.2d at 72 ; Wertz , 313 Ga. App. at 205, 721 S.E.2d at 126. While the Court will structure its analysis in accordance with the above elements, in light of the statements made in the May 10, 2014 email, the Court must first, as a threshold matter, determine if the email constitutes defamation per se before analyzing the remaining elements of Plaintiffs' defamation claim.
a. Whether the May 10, 2014 Email Constitutes Defamation per se
In light of the contents of Rongstad's May 10, 2014 email, see supra at 1342; Rongstad Dep., Ex. 6, the Court must first determine whether, as a matter of law, the statements in the email constitute defamation per se in accordance with O.C.G.A. § 51-5-4(a)(1), the only category which arguably applies after reviewing the email in its entirety. That statutory section, in turn, categorizes the "[i]mput[ation] to another [of] a crime punishable by law" as defamation per se.
Generally, statements that are libelous per se
Consist[ ] of a charge that one is guilty of a crime, dishonesty or immorality. Statements that tend to injure one in his trade or business also are libelous per se. When determining whether words are defamatory as a matter of law, courts may not hunt for strained constructions and must rely upon the words themselves in considering whether a statement was defamatory per se. Defamatory words which are actionable per se are those which are recognized as injurious on their face-without the aid of extrinsic proof. However, if the defamatory character of the words does not appear on their face but [they] only become defamatory by the aid of extrinsic facts, they are not defamatory per se, but per quod, and are said to require innuendo. The law is abundantly clear in Georgia-words that are libelous per se do not need innuendo.
Smith , 341 Ga. App. at 788, 802 S.E.2d at 72 (alterations in original); see Cottrell , 299 Ga. at 524-25, 788 S.E.2d at 781-83 ; see also O.C.G.A. § 51-5-4 (setting forth categories of slander or oral defamation).[9] With respect to statements that impute to another a crime punishable by law, the Georgia Supreme Court has opined that "[t]o constitute slander per se, ... the words at issue must charge the commission of a specific crime punishable by law.
*1351 Where the plain import of the words spoken impute no criminal offense, they cannot have their meaning enlarged by innuendo." Cottrell , 299 Ga. at 524, 788 S.E.2d at 781 (quoting Dagel v. Lemcke , 245 Ga. App. 243, 244, 537 S.E.2d 694 (2000) ).
Here, the plain words in Rongstad's email included the phrase "[t]his appears to be Insurance Fraud." Rongstad Dep., Ex. 6. Thus, [t]o determine if these words are defamatory per se, [courts] consider their natural and obvious meanings and look[ ] to the plain import of the words." Smith , 341 Ga. App. at 789, 802 S.E.2d at 72. As an initial matter, in the State of Georgia, insurance fraud is a felony punishable "by imprisonment for not less than two nor more than ten years, or by a fine of not more than $10,000.00, or both."[10] O.C.G.A. § 33-1-9. In addition, the phrase "[t]his appears to be Insurance Fraud," as set forth in Rongstad's email, on its face "charge[s] the commission of specific crime [i.e. , insurance fraud] punishable by law," Cottrell , 299 Ga. at 524, 788 S.E.2d at 781, and thus these words are "injurious on their face-without the need of extrinsic proof." Smith , 341 Ga. App. at 788, 802 S.E.2d at 72. To be sure, these words, in themselves, and when read within the context of the rest of the email, require no interpretation or innuendo to glean their meaning but instead clearly "give the impression that the crime [of insurance fraud] is actually being charged against [Plaintiff] and [is] couched in language as might reasonably be expected to convey such meaning to a [reader] of the statement." Cottrell , 299 Ga. at 524, 788 S.E.2d at 781. Put another way, the average reader viewing this email could "reasonably conclude from what is said that the comments are imputing a crime to plaintiff." Id. ; see Lucas v. Cranshaw , 289 Ga. App. 510, 513, 659 S.E.2d 612, 615 (2008) ("A publication claimed to be defamatory must be read and construed in the sense in which the readers to whom it is addressed would ordinarily understand it.").
Thus, the Court finds, that as a matter law, the explicit statements set forth in Rongstad's email when considered within the context of the entire writing from the standpoint of the average reader constitute defamation per se in accordance with O.C.G.A. § 51-5-4(a)(1). See Turnage v. Kasper , 307 Ga. App. 172, 184, 704 S.E.2d 842, 854 (2010) ("Turnage's statement to Kasper's neighbor that Kasper was a known drug user, a claim which Turnage himself admitted that he had no evidence to support, imputed to her a crime punishable by law, and thus alone was sufficient to serve as the basis for her claim of slander per se."); King v. Masson , 148 Ga. App. 229, 231(1)( ), 251 S.E.2d 107 (1978) (affirming jury verdict in favor of plaintiff based upon defendant's slanderous statement that plaintiff was "a dope addict" and "on drugs"); Giles v. Heyward , 315 Ga. App. 409, 411, 726 S.E.2d 434, 436 (2012) (finding that "accusations of adultery and attempted theft, which are crimes under the laws of Georgia" constituted slander per se "by imputing the commission of a crime to another"); but see McGee v. Gast , 257 Ga. App. 882, 884, 572 S.E.2d 398, 400 (2002) (recognizing that "To constitute slander per se ... the words at issue must charge the commission of a specific crime punishable by law" and opining that statements that certain persons were engaging in "illegal activities," without more, was insufficiently vague to constitute defamation per se); Swanson Towing & Recovery, LLC v. Wrecker 1, Inc. , 342 Ga. App. 6, 11, 802 S.E.2d 300, 305 (2017) (no defamation per se where "defendants' statements characterizing the plaintiffs as without morals *1352 and as 'mean, vulgar, demeaning[ ] crook[s]' do not allege a specific crime.").
While Defendants assert that Rongstad's statement that "this appears to be insurance fraud" is "plainly Rongstad's opinion, and not a statement of fact," Defendants' Memorandum of Law in Support of their Motion for Summary Judgment (Doc. 70-1) ("Defs.' Mem.") at 21, the Court respectfully disagrees. Rather, a natural reading of the statement, even considering Rongstad's use of the qualifying phrase "this appears," would lead the average reader to the conclusion that the writing, on its face, is stating a defamatory fact about the Plaintiffs that can potentially be proven false (i.e. , Rongstad's allegation that Plaintiffs have engaged in insurance fraud can arguably be proven false by Plaintiffs' proffering of relevant facts and evidence that the activities engaged in were undertaken for a lawful purpose). See Cottrell , 299 Ga. at 523, 788 S.E.2d at 781 ; Gettner , 297 Ga. App. at 261, 677 S.E.2d at 154 ("An opinion can constitute actionable defamation if the opinion can reasonably be interpreted, according to the context of the entire writing in which the opinion appears, to state or imply defamatory facts about the plaintiff that are capable of being proved false."); Bryant , 311 Ga. App. at 234-35, 715 S.E.2d at 463-64 ("defendant is not spared from liability simply by couching an alleged defamatory falsehood in the context of an opinion...."); Dougherty v. Harvey , 317 F.Supp.3d 1287, 1291-92 (N.D. Ga. 2018) (finding that the character of the phrase that plaintiff "may or may not be HIV positive" was "apparent on its face ... [since] [t]he plain import of the words spoken charge [plaintiff] with having HIV-a 'contagious disorder' within the meaning of O.C.G.A. § 51-5-4(a)(2) [and] [n]either extrinsic facts nor innuendo is necessary to establish the defamatory character of the words."); see also Milkovich , 497 U.S. at 18-19, 110 S.Ct. at 2705-06, 111 L.Ed.2d 1 ("Even if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact. Simply couching such statements in terms of opinion does not dispel these implications[.]").
Therefore, for the foregoing reasons, the Court finds that as a matter of law, Rongstad's use of the phrase "[t]his appears to be insurance fraud," constitutes defamation per se.[11]
b. Whether the May 10, 2014 was Published to a Third Party
To be actionable, an alleged defamatory statement must be published to a third party. See Saye , 295 Ga. App. at 130, 670 S.E.2d at 821 ("Publication of the statement is imperative and, without it, the defamation claim fails.") (citing O.C.G.A. § 51-5-1(b). See supra at 1347-48 (setting forth legal principles as to what constitutes a "publication"). In the instant case, after composing the May 10, 2014 email, Rongstad sent the email "to members of team and MKA" which included "eight persons involved with the Escambia County loss." Defs.' 56.1 Statement ¶¶ 63, 66. These *1353 eight individuals, in turn, were affiliated with the following entities MKA ("clerk [of the] works" hired by VeriClaim), Escambia County (contracted directly with StopLoss), Whitman & Whitman (insurance broker or agent for Escambia County) and VeriClaim (insurance adjuster). Id. ¶ 74. Defendants do not dispute that a "publication" was made here. See Defs.' Mem. at 23 (conceding that a "publication was made" but asserting that "conditional privilege applies."). Therefore, the Court finds that the "publication" element has been satisfied.
c. Whether the May 10, 2014 Email was Conditionally Privileged
In order prove that a statement is conditionally privileged, the party charged with making the otherwise defamatory statement must show that "(a) she acted in good faith; (b) in connection with an interest to be upheld; (c) the statement was properly limited in its scope and occasion; and (d) publication was made to proper persons." Smith , 341 Ga. App. at 790, 802 S.E.2d at 73 ; see Hammer , 20 F.3d at 1141. See supra at 1348-49 (setting forth legal requirements to assert and rebut whether conditional privilege applies).
Defendants assert that "Rongstad acted in good faith when he sent out the e-mail because he had an interest to uphold (to prevent insurance fraud by StopLoss), his statement was properly limited in scope and upon a proper occasion (during the course of his employment with VeriClaim), and the publication was made to proper persons (the team working directly with [ ] Rongstad on the Escambia County project) [and that] [g]iven this demonstration, conditional privilege applies." Defs.' Mem. at 23.
In response, Plaintiffs assert that "[e]vidence of malice is replete throughout the record in this case." Plaintiffs' Response in Opposition to Defendants' Motion for Summary Judgment (Doc. 76) ("Pls.' Opp'n") at 2. Specifically, Plaintiffs assert that prior to Rongstad sending the May 10, 2014 email, "Rongstad would, in the presence of StopLoss' client, Escambia County, falsely accuse StopLoss of [1] [n]ot having enough employees to do the work; [2] [having] too many employees to do the work;" [3] [n]ot having enough equipment to do the work; and [4] [n]ot completing assigned tasks StopLoss had in fact completed." Id. In addition, Plaintiffs state that Rongstad accused StopLoss of having "50-60 employees standing/sitting around, apparently doing nothing" and that Rongstad at one point had allegedly stated that he "ha[s] a company parked up on the interstate ready to come in and take over this project." Id. at 3 (quoting Brooks Dep. at 29, 49, 50). Moreover, Plaintiffs maintain that (1) "Rongstad's public interactions with StopLoss were routinely accusatory creating an atmosphere that was 'extremely intense;' " (2) attendees of the 10:00 a.m. meetings "concluded ... [that Rongstad] was trying to get the County to fire StopLoss and bring in a different company;" and (3) that Rongstad had, over the years enjoyed cocktails with BELFOR[12] personnel under various circumstances including fishing trips, crawfish boils and association meetings" and that Rongstad "like[d] attending BELFOR-hosted events." Id. at 4. Furthermore, Plaintiffs claim that Defendants' refusal to retract the email "is more evidence of malice." Id. at 6 (citing cases).
Assuming, without deciding, that Defendants have met their burden of establishing that the statements made in the May 10, 2014 email were conditionally privileged, the Court nevertheless, after considering the entire record, finds that Plaintiffs have come forward with sufficient evidence to create a genuine issue of material fact as to whether Rongstad sent *1354 the email "with knowledge that it was false or with reckless disregard for whether it was true or false." Hammer , 20 F.3d at 1142 ; see Wertz , 313 Ga. App. at 207, 721 S.E.2d at 127 (The effect of [a conditional] privilege is to require the plaintiff to prove actual malice [i.e. , knowledge of a statement's falsity or making a statement with reckless disregard for whether it was true or false].") (first alteration in original).
While the Court has already set forth the undisputed facts, and will not do so again here, these facts, which are supported by evidence in the record, could lead a reasonable jury to find that Rongstad sent the May 10, 2014 email because: (1) he harbored a certain animus towards Plaintiffs as evidenced by many of the statements he made during the 10:00 a.m. daily meetings, see supra at 1340-41; and (2) he was motivated by a desire to convince Escambia County officials to remove Plaintiffs so he could recommend BELFOR, a remediation company which he "used throughout the years many times" and which he has recommended multiple times, as a viable replacement. Rongstad Dep. at 18-19. In addition, the undisputed facts establish that Rongstad had, in the past, attended fishing trips, crawfish boils and association meetings hosted by BELFOR. Pls.' 56.1 Statement ¶ 66.
In addition, at least some of Rongstad's actions and omissions preceding the dissemination of the May 10, 2014 email could lead a reasonable jury to conclude that sending the email amounted to at least recklessness given that: (1) after observing a StopLoss worker "dumping water from a five-gallon bucket onto the floor" while "two other workers use[d] squeegees to move the water" and despite the fact that he "was shocked" by what he saw, Rongstad decided not to take any photos or otherwise document what he saw because it "[w]as too horrible to document [ ] with a camera," Rongstad Dep. at 48-53;"[13] (2) Rongstad did not ask any of the StopLoss employees on site what they were doing, but instead jumped to a potentially erroneous factual conclusion, id. ; (3) Rongstad composed and sent the email before any bona fide investigation could have been completed by MKA, and given that Michael Cox, who was tasked by Rongstad to make the inquiry himself believed that despite Rongstad's concern "StopLoss was probably engaged in sanitation" since "[d]uring the sanitation process ... sometimes you mix sanitizer in with the water and use that solution [to decontaminate the floor] ... and that's what I took it as," Cox. Dep. at 34; and (4) Rongstad never revisited the issue with Michael Cox or addressed it directly with Plaintiffs. Rongstad Dep. at 54 (stating that he "did not bother with [the issue of StopLoss employees making the concrete wet] any further after that [conversation with Michael Cox] )."
While the record includes facts and testimony that may explain or refute the evidence of malice submitted by Plaintiffs, the Court's function in reviewing motions for summary judgment is not to resolve issues of fact presented by conflicting evidence since that role is solely within the province of the jury. See Warrior Tombigbee Transp. Co. v. M/V Nan Fung , 695 F.2d 1294, 1299 (11th Cir. 1983) ("When faced with a motion for summary judgment it is no[t] part of the [trial] court's function to decide issues of fact but solely to determine whether there is an issue of fact to *1355 be tried.") (internal citation omitted (second alteration in original); Tullius v. Albright , 240 F.3d 1317, 1320 (11th Cir. 2001) ("If the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial."). Indeed, "[a]t the heart of this dispute are issues of credibility: whether one believes [Plaintiffs'] evidence or that of the [Defendants] [and the Eleventh Circuit] ha[s] repeatedly held that credibility is a factual issue that is uniquely the province of the jury." Hammer , 20 F.3d at 1143 ; see United States v. Chastain , 198 F.3d 1338, 1351 (11th Cir. 1999) ("To the extent that Appellants' argument depends upon challenges to the credibility of witnesses, the jury has exclusive province over that determination...."); see also United States v. Broughton , 689 F.3d 1260, 1277 (11th Cir. 2012) ("The jury is free to choose between or among the reasonable conclusions to be drawn from the evidence presented at trial, and the court must accept all reasonable inferences and credibility determinations made by the jury.").
d. Whether Rongstad's Dissemination of the May 10, 2014 Email was Negligent
Finally, the Court finds that genuine issues of material fact exist as to whether Defendants exercised the requisite degree of care in verifying the truth or falsity of the statements made prior to disseminating the email.[14] Indeed, based upon the evidentiary record, a reasonable jury could find that Rongstad, by (1) failing to take any photographs or otherwise document what he had witnessed; (2) not asking StopLoss personnel who were engaged in the activity what they were doing and why; (3) failing to inquire with Michael Cox if there may have been a legitimate purpose for StopLoss' actions prior to disseminating the email; and (4) composing and sending the email prior to Michael Cox concluding his inquiry (which was requested by Rongstad), failed to act with the requisite degree of care that an ordinary prudent person in his position would have utilized and, on that basis, his action in sending the email was negligent. However, in light of the fact that such a determination would necessarily involve issues of credibility and because a jury could, in the alternative find, based upon the entire record, that Rongstad's actions were not negligent in light of the totality of circumstances, this question is one for the jury. See Hammer , 20 F.3d at 1143 (credibility issues are for the jury); see also Braun v. Soldier of Fortune Magazine, Inc. , 968 F.2d 1110, 1114 (11th Cir. 1992) ("Once a court finds that a legal duty exists, it generally leaves for the jury issues of negligence and proximate cause."); Woodward v. Atl. Coast Line R.R. , 57 F.2d 1019 (5th Cir. 1932) ("Where uncertainty as to the existence of negligence arises from a conflict in the testimony or because, the facts being undisputed, fairminded men will honestly draw different conclusions from them, the question is not one of law but of fact to be settled by the jury.").[15]
*1356 V. CONCLUSION
Based upon the foregoing analysis, Defendants' motion for summary judgment is DENIED and Plaintiffs' cross-motion for summary judgment is GRANTED, in part .[16] Specifically, Plaintiffs' motion is granted solely to the extent that (1) the May 10, 2014 email, as a matter of law, constitutes defamation per se and (2) the May 10, 2014 email was "published" to a third party. The remaining elements of Plaintiffs' claim of defamation, in the event the parties are unable to settle this matter, shall be adjudicated at trial.
Prior to the scheduling of a trial in this matter, the parties are directed to engage in mediation in order to attempt to come to an amicable resolution of this case. As such, the parties shall arrive at a mutual agreement concerning their choice of a private mediator not later than October 5, 2018 and advise the Court of the name of the mediator selected by filing a notice on the electronic docket. The mediation itself shall be completed not later than November 19, 2018. Not later than three (3) calendar days following the final mediation session the parties shall submit a joint status report to the Court, by filing the same on the electronic docket, as to the outcome of the mediation. All deadlines in this action are STAYED and the case is ADMINISTRATIVELY CLOSED pending the outcome of the mediation. In the event a resolution is not reached, the parties shall submit a proposed consolidated pretrial order by December 19, 2018.
IT IS SO ORDERED this 26th day of September, 2018.

Only Counts I, IV and V are presently before the Court as Counts II and III were previously dismissed on April 13, 2017. See (Doc. 39).

" '[F]acts,' as accepted at the summary judgment stage of the proceedings, may not [ultimately] be the 'actual' facts of the case." Priester v. City of Riviera Beach, Fla. , 208 F.3d 919, 926 (11th Cir. 2000) ; see Morton v. Kirkwood , 707 F.3d 1276, 1280 (11th Cir. 2013).

As the Court has determined that the citations to evidence as contained in the Rule 56.1 Statements generally supports the factual assertions being made, for ease of reference, the Court will primarily cite directly to the Rule 56.1 Statements unless a direct or parallel citation to the underlying evidentiary material is found to be necessary.

"VeriClaim is a loss adjustment and claims management company that [assists] its clients, typically insurance companies, investigate catastrophic losses suffered by insureds, apply insurance coverages, evaluate the costs associated with the loss, and settle the losses." Defs.' 56.1 Statement ¶ 5.

"One of the buildings being remediated ... consisted of two functionally separate buildings under one roof - the Sheriff's Evidence Room and Sheriff's Warehouse. While sharing a roof, the Evidence Room and the Warehouse had separate entrances." Defs.' 56.1 Statement ¶¶ 27-28. While the "Evidence Room [consisted] of a secure area for the storage of evidence in criminal cases ... the Sheriff's Warehouse was simply a warehouse." Id. ¶¶ 29, 35.

The evidentiary record is ambiguous as to what date Rongstad's meeting with MKA occurred and the parties dispute whether the meeting occurred prior to or subsequent to the dissemination of the May 10, 2014 email. In addition, the record is not entirely clear whether Rongstad had more than one brief meeting with MKA concerning the Sheriff's Warehouse incident. Comapre Rongstad Dep. at 68, 70 ("After I finished my rounds [on May 10, 2014], I went into the office [in order] to get MKA on top of this. There were several people [there and] [w]e had a hallway meeting ... It was a quick one-, two-minute meeting. 'Take care of it.' "); Rongstad Decl. ¶ 13 ("After observing the incident [at the Sheriff's Warehouse], I finished my rounds and returned to the project management office [where] I described the incident to MKA employees, including Michael Cox[.]") with Cox Dep. at 69 (answering that he and Rongstad had "one conversation a couple of days after that e-mail went out and it was very brief and it was as I've described earlier" in response to the question "After May 10th, 2014, the e-mail and the subsequent discussion that you all had about Mr. Rongstad's e-mail, did he raise the issue about StopLoss pouring water into buildings with you again?").

The parties do not dispute that Georgia law applies in this diversity action.

"In considering whether a writing is defamatory as a matter of law, [courts] look at what construction would be placed upon it by the average reader." Webster v. Wilkins , 217 Ga. App. 194, 195, 456 S.E.2d 699, 701 (1995)

"[T]he requirements for slander per se apply to libel per se because, as noted, the definition of slander in Georgia has been incorporated into the definition of libel." Cottrell , 299 Ga. at 524, 788 S.E.2d at 781.

Neither party disputes that engaging in insurance fraud is a crime.

The Court's finding that the May 10, 2014 email constitutes defamation per se does not otherwise relieve Plaintiffs of their burden to come forward with sufficient evidence to establish the remaining elements of their defamation claim, namely that the statements were (1) unprivileged; (2) published to a third party and (3) fault on the part of Defendants amounting to at least negligence. This is because a finding that a statement is defamatory per se only affects Plaintiffs' burden as to the final element, producing evidence of special damages, since where a statement is found to constitute defamation per se damages are inferred. See Strange v. Henderson , 223 Ga. App. 218, 219, 477 S.E.2d 330, 332 (1996) ; Bellemead, LLC v. Stoker , 280 Ga. 635, 637, 631 S.E.2d 693, 695 (2006).

"BELFOR" is a competitor in the area of disaster remediation.

Although in his email Rongstad stated that "documentation exists in several forms," Rongstad Dep., Ex. 6, during his deposition he could not remember what documentation he was referring to but was sure certain documentation existed since he "wrote the [ ] sentence." Rongstad Dep. at 65, 102.

"It does seem incongruous [for] common law to state that a defamation action may be based on common law malice and negligence [since] '[m]alicious,' meaning full of malice, connotes an act of intentional hostility which seems to contradict the possibility of negligence. To avoid confusion, one must remember that malice and negligence support different essential elements of the tort. A statement may be brutally malicious but will not support an action for defamation unless it is also false. Negligence measures only the defendant's degree of care in verifying the truthfulness of the statement. Straw v. Chase Revel, Inc. , 813 F.2d 356, 363 (11th Cir. 1987).

After the Eleventh Circuit was carved out of the old Fifth Circuit, the Eleventh Circuit adopted all decisions of the former Fifth Circuit decided prior to October 1, 1981 as binding precedents. See Bonner v. City of Prichard , 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

Since questions of material fact remain and must be presented to a jury, the Court finds it premature to address Plaintiffs' requests for punitive damages and attorney's fees. Therefore, these issues will likewise be determined at trial.